# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Detention of Hunter*, 2013 IL App (4th) 120299

---

| | |
|---|---|
| Appellate Court Caption | In re: the Detention of ANTHONY L. HUNTER, a Sexually Dangerous Person, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. ANTHONY L. HUNTER, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0299 |
| Filed<br>Rehearing denied | January 9, 2013<br>February 4, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The order for respondent's commitment as a sexually dangerous person was upheld over his contentions that the Sexually Dangerous Persons Act violated the confrontation clause and that the evidence did not satisfy the demonstrated-propensities requirement of the Act, since the expert testimony admitted under the Act concerning respondent's propensities did not implicate the confrontation clause, even though it was based on hearsay police reports and interviews, and the expert testimony sufficiently proved that it was substantially probable that respondent would reoffend if not confined. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 10-CF-245; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Costello (argued), of Costello Law Office, of Springfield, for appellant. |
|---|---|
| | John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Presiding Justice Steigmann and Justice Knecht concurred in the judgment and opinion. |

## OPINION

¶ 1    Respondent, Anthony L. Hunter, was charged with aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2008)) and criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2008)). While those criminal charges were pending, the State instituted a civil commitment proceeding, pursuant to Illinois's Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 to 12 (West 2008)). After a jury trial, the circuit court declared respondent a sexually dangerous person and ordered his commitment. Respondent's posttrial motion was denied, and he appealed.

¶ 2    Respondent argues his commitment as a sexually dangerous person should be reversed because (1) the Act is unconstitutional, on its face and as applied, as violative of the confrontation clause, or in the alternative, (2) the State's evidence was insufficient to satisfy the demonstrated-propensities requirement of the Act. We find no constitutional violation and affirm on both grounds.

¶ 3                          I. BACKGROUND

¶ 4    On May 13, 2010, respondent was charged by information with one count of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2008)) and one count of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2008)) for physically attacking Emma in respondent's home and penetrating her vagina with his fingers on April 20, 2010. The criminal charges were pending when, on May 19, 2010, the State filed a petition to declare respondent a sexually dangerous person. The State requested the appointment of two psychiatrists to examine respondent. Pursuant to the circuit court's order, respondent was subsequently examined by Drs. Terry Killian and Lawrence Jeckel. After examining respondent, both concluded respondent qualified as a sexually dangerous person as defined in the Act.

¶ 5    A hearing was conducted on March 7 and 8, 2012. At the hearing, the State presented the testimony of Drs. Killian and Jeckel, both of whom testified that respondent was a sexually dangerous person. Dr. Killian testified he was employed as a forensic psychiatrist and, in that capacity, he had evaluated around 150 people to determine whether they were sexually dangerous. When conducting the initial evaluations, he has found the person to be sexually dangerous in approximately 60% of the cases. The circuit court accepted Dr. Killian as an expert in the field of psychiatry.

¶ 6    Dr. Killian testified he conducted respondent's evaluation on August 26, 2010. The prosecutor had forwarded over 100 pages of documents to be reviewed. A social worker in Dr. Killian's office reviewed the records and prepared a summary for the doctor's use during the interview with respondent. Included in the documents was information about particular incidents of respondent's past sexual misconduct. Dr. Killian testified it was "normal and routine" and "essential" for psychiatrists to rely on police reports of prior criminal conduct in performing sexually-dangerous-person evaluations. He said he takes "all the information that is available to [him], which includes the police reports and sometimes other documents, could be [Illinois Department of Children and Family Services] reports, and the information from evaluating, from interviewing the defendant, as well as any other documents [he has], mental health records, other evaluations that have been done, take all of that, put it together to try to make the best sense of how everything fits together."

¶ 7    The first of respondent's prior sexual incidents occurred in 1987 and involved a victim named Sheri. Dr. Killian noted that respondent pleaded guilty to a reduced charge of criminal sexual abuse related to this incident. A police report revealed that Sheri had described the incident as a violent rape. She had been helping respondent move to a different home when he grabbed her, dragged her into the bedroom, and dug his fingernails into her mouth to keep her quiet while he raped her. The police had observed injuries consistent with her version of the event. Respondent had given police a very different version, where he had portrayed himself as the victim. He said Sheri had asked him to have sex with her, and then " 'for no reason,' " she assaulted him. In his interview, respondent told Dr. Killian he had no memory of the incident or of a person named Sheri.

¶ 8    Approximately 16 months after that incident, in 1989, respondent, then age 23, was involved in another incident–this one involving a victim named Laticia, age 15. Laticia said she had known respondent and that he had been at her home on the day of the incident. She was asleep, but she awakened to find respondent on top of her. He overpowered her and raped her. Dr. Killian said this case had been dismissed for unknown reasons.

¶ 9    In 1998, respondent was involved in another incident wherein he had been repeatedly asking an acquaintance named Rebecca, age 21, to remove her clothes. He offered her money to have sex with him and placed his hand on her upper thigh. Rebecca was respondent's friend's roommate.

¶ 10    In 2002, respondent had sexually assaulted his niece by marriage, Ashley, who was 13 years old. Respondent was copying movies to sell and Ashley indicated she wanted some for herself. Respondent told her the only way she could have copies was to sleep with him. She refused. He then grabbed her, pulled off her clothes, raped her, and told her not to tell

anyone. Respondent pleaded guilty because the deoxyribonucleic acid (DNA) evidence against him was "definitive." His semen was found in her vagina, and the medical examination indicated this was her first vaginal sexual experience. Respondent told the police the girl had begged him to have sex with her and he finally gave in.

¶ 11    During Dr. Killian's interview with respondent, respondent said he remembered the incident with Ashley, while he had not remembered anything about the three previous incidents. He said Ashley had wanted a copy of a movie and he told her " 'Ass, grass, or cash. Nobody rides for free.' " He said she agreed to have sex with him in exchange for a copy of the movie. Respondent pleaded guilty to aggravated criminal sexual assault.

¶ 12    Finally, in 2010, respondent was involved in the incident leading to the current charges. The victim, Emma, was respondent's "personal assistant." Respondent owed her money and she had gone to his home to collect. When she arrived, he grabbed her, pulled her into the bedroom, removed her clothes, and raped her. He told the police he was angry because Emma had cashed a check that he had written for $7,000 that was not to be cashed. The check was written only to teach Emma how to write a check for over $1,000. Respondent threatened to call the police on her for cashing this fraudulent check. According to respondent, Emma accused him of rape in response to his threat of turning her in on cashing a fraudulent check.

¶ 13    Dr. Killian also considered (1) respondent's nonsexual criminal history, which included "many arrests," and (2) three actuarial instruments in evaluating and predicting respondent's risk of reoffending. (Respondent admitted he had been arrested for domestic battery more than 10 times.) The first of the actuarial instruments used was the Static 99. Respondent scored a six, which indicated a high risk of reoffending. The second instrument was the Rapid Risk Assessment for Sex Offender Recidivism (RRASOR). Respondent scored a three, which placed him in the category of having a 36.9% likelihood over a 10-year period of reoffending. The third instrument was the Minnesota Sex Offender Screening Tool (MnSOST-R). Respondent scored a 10 (Dr. Killian corrected his testimony on cross-examination to reveal that respondent had actually scored a 12), which placed him in the high-risk category.

¶ 14    In addition to the actuarial testing, Dr. Killian also considered respondent's level of antisocial behavior in determining recidivism. During his interview with respondent, Dr. Killian noted that respondent mumbled "very badly," as if he had suffered a stroke. Then, after approximately 10 minutes, respondent began speaking more clearly. The doctor believed respondent was faking a speech problem to present himself as a weakened or disabled individual.

¶ 15    Based upon Dr. Killian's observations, the review of the materials, and the results of the actuarial instruments, in his opinion, to a reasonable degree of medical certainty, respondent suffers from antisocial personality disorder, a mental disorder where he repeatedly violates other people's rights without remorse. This diagnosis, coupled with respondent's "strong tendencies to commit sex offenses," predisposes him to the commission of sex offenses. In Dr. Killian's opinion, respondent's mental disorder has existed for at least a year prior to the filing of the petition. Within a reasonable degree of psychiatric certainty, Dr. Killian opined

that respondent's mental disorder is coupled with a propensity to commit sex offenses. He also opined that, to a reasonable degree of psychiatric certainty, it is substantially probable that respondent will engage in the commission of sex offenses in the future if he is not confined. Finally, Dr. Killian opined that, to a reasonable degree of psychiatric certainty, respondent is a sexually dangerous person.

¶ 16    Next, Dr. Jeckel testified as the State's second expert. He said he operates a general practice in Champaign, Illinois, where two-thirds of his practice consists of general psychiatry and one-third consists of forensic psychiatry. This case was his thirty-fifth sexually-dangerous-person case. Like Dr. Killian, Dr. Jeckel reviewed the records related to respondent's criminal, psychiatric, substance-abuse, and incarceration history. He acknowledged it was this "type of information that psychiatrists would normally rely upon to do this kind of evaluation." After his review of the documentation, Jeckel personally interviewed respondent and prepared a report reflecting his observations and opinions.

¶ 17    On July 14, 2010, Dr. Jeckel interviewed respondent. With regard to the incident involving the victim Sheri, Dr. Jeckel noted respondent's aggressiveness in that situation as the most significant. With regard to the incident involving Laticia, Jeckel noted that respondent had "surprised," then "blitzed her with his sexual aggression." With regard to the incident involving Rebecca, Jeckel commented on respondent's insistence and demanding demeanor. With regard to the incident involving Ashley, Jeckel noted her familial relationship with respondent–the fact that he knew when she would be alone, and he again "blitzed her, pushed her down, had sex with her."

¶ 18    According to Dr. Jeckel, respondent had portrayed Ashley as aggressive, flirtatious, and "coming on to him." He noted respondent tended to portray his victims as the aggressors. With regard to the underlying incident involving Emma, the doctor again noted the victim was "allegedly blitzed" by respondent, but respondent had portrayed her as flirtatious and the aggressor. Dr. Jeckel further noted that during the police interview, respondent initially acted and appeared "very decrepit," was difficult to understand, and appeared "very disabled," yet at other times, he would "talk very clearly." This conduct led Dr. Jeckel to believe that respondent "is capable of malingering, that is, capable of faking or exaggerating his neurological deficits for the purpose of escaping culpability."

¶ 19    Dr. Jeckel testified he also considered respondent's nonsexual criminal history to determine whether respondent demonstrated a pattern of violence or violating social norms. Jeckel noted respondent's history of substance abuse and sociopathy. His family had a history of substance abuse and criminal activity. Respondent told Jeckel he had been sexually molested, but Jeckel was not convinced that was true.

¶ 20    Unlike Dr. Killian, Dr. Jeckel did not use actuarial instruments in respondent's evaluation. He said he was "not a big believer in it." Instead, he relied heavily on the clinical evaluation. At the conclusion of his evaluation, Dr. Jeckel opined that, to a reasonable degree of psychiatric certainty, (1) respondent suffers from two mental disorders, depressive disorder and a personality disorder (respondent's history of depression precluded a diagnosis of antisocial personality disorder); (2) respondent's mental disorder is coupled with a propensity to commit sex offenses; (3) respondent will engage in the commission of sex

offenses in the future if he is not confined; and (4) respondent is a sexually dangerous person.

¶ 21    Based upon this evidence, the jury found respondent to be a sexually dangerous person. Thereafter, the circuit court ordered respondent confined in a treatment facility operated by the Illinois Department of Corrections. After a hearing, respondent filed a posttrial motion, which the court denied. This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    Respondent appeals, claiming his commitment order as a sexually dangerous person must be vacated because the Act violates his right to confrontation and is contrary to the principles set forth in *Crawford v. Washington*, 541 U.S. 36 (2004). Respondent contends he was unable to confront his accusers, and therefore, he claims, the psychiatrists should not be allowed to rely upon hearsay in the form of police reports and police interviews with the victims to determine whether respondent has the propensity to commit sex offenses in the future. In the alternative, respondent contends the State failed to prove beyond a reasonable doubt that he is a sexually dangerous person.

¶ 24                            A. Constitutional Challenge

¶ 25    We begin by noting:

"All statutes carry a strong presumption of constitutionality. [Citation.] To overcome this presumption, a party challenging a statute must clearly establish that it violates the constitution. [Citation.] This court will affirm a statute's constitutionality if the statute is reasonably capable of such an interpretation. [Citation.] The question of whether a statute is unconstitutional is a question of law, and our review is *de novo*. [Citation.]" *People v. Johnson*, 225 Ill. 2d 573, 584 (2007).

¶ 26    Under *Crawford*, "testimonial" out-of-court statements are admissible only where (1) the declarant is unavailable, and (2) the defendant has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54. Our supreme court has observed that "[t]he sixth amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' " *People v. Williams*, 238 Ill. 2d 125, 142 (2010) (quoting U.S. Const., amend. VI), *aff'd, Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012).

¶ 27    However, we are not faced with a criminal prosecution in this case. It is understood that proceedings conducted under the Act are civil in nature. *People v. Burns*, 209 Ill. 2d 551, 553 (2004). Under the Act, the State may seek an involuntary, indeterminate commitment in lieu of a criminal prosecution if a respondent is charged with a criminal offense and is believed to be sexually dangerous. *Burns*, 209 Ill. 2d at 553. A sexually dangerous person is defined as a person who has suffered from a mental disorder for a period of not less than one year, who has criminal propensities to the commission of sex offenses, and who has demonstrated propensities toward acts of sexual assault or sexual molestation of children. 725 ILCS 205/1.01 (West 2008).

¶ 28    Though these proceedings are civil in nature (725 ILCS 205/3.01 (West 2008)), a

respondent is entitled to counsel, may demand a jury trial on the State's petition (725 ILCS 205/5 (West 2008)), and must be proved sexually dangerous beyond a reasonable doubt (725 ILCS 205/3.01 (West 2008)). That is, the respondent is "provided with some of the same procedural rights guaranteed in a criminal proceeding." *People v. Trainor*, 196 Ill. 2d 318, 324 (2001). This is so because the proceedings may result in a respondent's deprivation of liberty and incarceration for psychiatric treatment. *Trainor*, 196 Ill. 2d at 328.

¶ 29　The supreme court has stated that the purpose of the Act is "(1) to protect the public by sequestering a sexually dangerous person until such a time as the individual is recovered and released, and (2) to subject sexually dangerous persons to treatment such that the individual may recover from the propensity to commit sexual offenses and be rehabilitated." *Trainor*, 196 Ill. 2d at 323-24. Therefore, the Act is aimed at care and treatment, rather than punishment and deterrence. *Trainor*, 196 Ill. 2d at 325.

> "While the question of whether an individual is a sexually dangerous person is one of fact, it is one which, by its nature, cannot be answered by a court or jury without hearing the opinions of people who have a special knowledge in the field of mental disorders and sexual aberration. [Citation.] Thus, after filing a petition alleging sexual dangerousness, the trial court must appoint two psychiatrists to make a personal examination of the person so charged and determine whether such person is sexually dangerous. 725 ILCS 205/4 (West 1998)." *Trainor*, 196 Ill. 2d at 327.

The two psychiatrists must rely on their personal examinations of respondent in light of their professional expertise to determine the issue. Drs. Killian and Jeckel testified that to do so, they each review an overall history of a respondent, including prior arrest records, police reports, witness statements, mental-health records, and any other documents they find relevant to the issue to be determined. In fact, section 5 of the Act provides that "it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were inflicted." 725 ILCS 205/5 (West 2008). This information, respondent argues, is hearsay and should not be allowed to be used in the jury's determination of whether he is a sexually dangerous person.

¶ 30　Our supreme court has noted that in proceedings under the Act, even though they are considered civil in nature, the right to due process applies and "entitles the defendant to the right to confront and cross-examine witnesses testifying against him." *Trainor*, 196 Ill. 2d at 329. "[O]ur legislature intended rigid adherence to rules of evidence and that every necessary element of the State's petition be proved by competent evidence." *Trainor*, 196 Ill. 2d at 329. Thus, *Crawford* applies to proceedings under the Act.

¶ 31　The issue in this case though is whether the testimony of the psychiatrists, by relying, at least partially, on hearsay evidence not subject to cross-examination, violated *Crawford* and in turn, violated respondent's right to confront witnesses against him. Based on the following, we find no constitutional violation.

¶ 32　Illinois courts have "long held that prohibitions against the admission of hearsay do not apply when an expert testifies to underlying facts and data, not admitted into evidence, for the purpose of explaining the basis of his opinion." *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009). This was first decided in *Wilson v. Clark*, 84 Ill. 2d 186 (1981), a decision in which

our supreme court adopted Federal Rules of Evidence 703 and 705 (Fed. Rs. Evid. 703, 705), governing the content of an expert's testimony. "[A]n expert may give opinion testimony which relies upon facts and data not in evidence, as long as the underlying information is of the type reasonably relied upon by experts in the particular field." *Lovejoy*, 235 Ill. 2d at 142. "While the contents of reports relied upon by experts would be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion." *People v. Nieves*, 193 Ill. 2d 513, 528 (2000).

¶ 33    "The underlying information 'must be sufficiently trustworthy to make the reliance reasonable.' [Citation.] Provided the foundational requisites are met, an expert is permitted 'not only to consider the reports commonly relied upon by experts in their particular field, but also to testify to the contents of the underlying records.' " *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51 (quoting *Bass v. Cincinnati Inc.*, 281 Ill. App. 3d 1019, 1024 (1996), and *Lovejoy*, 235 Ill. 2d at 143). This standard has been codified in the Illinois Rules of Evidence, effective January 1, 2011. See Ill. R. Evid. 703 (eff. Jan. 1, 2011) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

¶ 34    Both experts identified several types of documents considered relevant by psychiatrists in gathering a respondent's history, including police reports, witness statements, health records, and mental-health records. The documents relied upon by Drs. Killian and Jeckel "contained a wide range of data about respondent, including his own statements and admissions as well as opinions and observations of him and even accusations against him, couched in possibly multiple levels of hearsay." *Hooker*, 2012 IL App (2d) 101007, ¶ 63 (addressing a respondent's inadmissible hearsay argument in the context of a sexually violent person case).

¶ 35    However, the information gathered from the various documents contained competent factors for the experts to consider in conducting their evaluations. In particular, the information contained in the police reports and witness statements, though testified to at trial by the experts, was not admitted as substantive evidence. The circuit court instructed the jury that such evidence was admitted "for the limited purpose of explaining the basis of the expert opinion; it should not be considered *** as substantive evidence as to the issue of whether the defendant has demonstrated a propensity to commit sex offense[s]." Each expert testified he relied upon the information contained in these police reports and other documents in making his overall determination of respondent's sexual dangerousness, as is typical of experts in the field of psychiatry.

¶ 36    Although the information testified to by the State's experts (the contents of the police reports) would be inadmissible hearsay if offered for the truth of the matter asserted, it was not offered for that purpose, and therefore, it does not trigger a confrontation violation. The record is clear that the experts' testimony was offered for the limited purpose of explaining how they arrived at their respective opinions. The reports upon which they relied were of the nature and type routinely reviewed and relied upon by experts in the field and the experts

-8-

here were subject to cross-examination. Consequently, we hold respondent's right to confront witnesses was not violated by the presentation of the testimony of Drs. Killian and Jeckel. *Wilson*, 84 Ill. 2d at 194 ("allowing expert opinions based on facts not in evidence dispenses with 'the expenditure of substantial time in producing and examining various authenticating witnesses. *** [The physician's] validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.' " (quoting Fed. R. Evid. 703, Advisory Committee Note)). That is, "the confrontation clause does not bar the admission of testimonial statements that are admitted for purposes other than proving the truth of the matter asserted." *Williams*, 238 Ill. 2d at 142.

¶ 37　　Recently, the United States Supreme Court affirmed our supreme court's decision in *Williams*, where a plurality of the Supreme Court, composed of Chief Justice Roberts and Justices Kennedy, Breyer and Alito, held that the confrontation clause of the sixth amendment was not implicated by expert opinion testimony from a forensic DNA analyst who did not personally conduct the DNA analysis. The Court affirmed the judgment of the Illinois Supreme Court. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2244. The plurality of the Court concluded that the confrontation clause was not violated. The Court majority held:

> "We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228.

The Court further noted: "For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case. Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228. Overall, the Illinois Supreme Court's decision remains unaffected and the rule stands that the confrontation clause is not violated when an expert's testimonial statements are admitted for purposes other than proving the truth of the matter asserted. *Williams*, 238 Ill. 2d at 142.

¶ 38　　It is apparent from the record that Drs. Killian and Jeckel did not testify as to the contents of the police reports and other documents to establish the truth of the matter asserted in those reports. Rather, the information, as testified to, was presented for the purpose of explaining the bases for their opinions. See *Lovejoy*, 235 Ill. 2d at 143. "Consequently, there was no confrontation clause violation." *Williams*, 238 Ill. 2d at 144.

¶ 39　　For the foregoing reasons, we find no error in the trial court's decision to allow the State's experts to testify regarding respondent's past misconduct as it pertained to their evaluations. The testimony did not violate respondent's constitutional right to confront witnesses against him.

¶ 40                              B. Sufficiency of the Evidence

¶ 41       Next, respondent challenges the sufficiency of the evidence. In particular, he contends
the State failed to present sufficient evidence to prove the fourth and fifth propositions set
forth in the jury instruction defining a sexually dangerous person. He claims the experts'
testimony on these matters was unsatisfactory since they cannot possibly accurately predict
the future. He contends this inability to predict leads to the reasonable conclusion that they
cannot state, beyond a reasonable doubt, that respondent "will engage in the commission of
sex offenses in the future if not confined."

¶ 42       We begin with the language of the Act, which defines the term "sexually dangerous
persons" as follows:

           "All persons suffering from a mental disorder, which mental disorder has existed for
      a period of not less than one year, immediately prior to the filing of the petition
      hereinafter provided for, coupled with criminal propensities to the commission of sex
      offenses, and who have demonstrated propensities toward acts of sexual assault or acts
      of sexual molestation of children ***." 725 ILCS 205/1.01 (West 2008).

¶ 43       Pursuant to this definition, commitment under the Act requires the State to convince the
trier of fact beyond a reasonable doubt (725 ILCS 205/3.01 (West 2008)) that (1) the person
has a "mental disorder" of the prescribed duration, (2) the mental disorder is associated with
criminal propensities to the commission of sex offenses, and (3) the person has actually
demonstrated that propensity. This statutory definition and the supreme court's decision in
*People v. Masterson*, 207 Ill. 2d 305, 330 (2003), were used to fashion the jury instruction,
which set forth five propositions the State needed to prove in order for the jury to find
respondent to be a sexually dangerous person. In this appeal, respondent challenges the
sufficiency of the evidence related only to the final two propositions, namely that (1)
respondent had "demonstrated propensities toward acts of sexual assault or sexual
molestation of children," and (2) it was "substantially probable the respondent will engage
in the commission of sex offenses in the future if not confined."

¶ 44       On appeal from a jury's ruling on a sexually-dangerous-person petition, the reviewing
court will affirm the judgment, after considering all of the evidence introduced at trial in the
light most favorable to the State, if it determines that any rational trier of fact could have
found the essential elements to be proved beyond a reasonable doubt. *People v. Bailey*, 405
Ill. App. 3d 154, 171 (2010). "The reviewing court will not substitute its judgment for that
of the trial court or jury on the factual issues that have been raised in the petition, unless the
evidence is so improbable as to raise a reasonable doubt that the defendant is a sexually
dangerous person." *Bailey*, 405 Ill. App. 3d at 171.

¶ 45       To prove the fourth proposition, that respondent has demonstrated propensities toward
acts of sexual assault or sexual molestation of children, the State was required to prove
respondent had committed or attempted to commit at least one act of sexual assault or
molestation. *People v. Allen*, 107 Ill. 2d 91, 105 (1985). The State was not required to prove
multiple sex crimes. *Allen*, 107 Ill. 2d at 105. The primary purpose of the definition in the
statute (and the corresponding propositions set forth in the jury instructions) is for the trier
of fact to *predict* a respondent's future conduct. Thus, there exists the requirement that a

respondent must have demonstrated the propensity by the commission of at least one act. This way, the determination of whether the respondent is a sexually dangerous person will be based on something more than "psychological speculation." *Allen*, 107 Ill. 2d at 105.

¶ 46      In this case, the State introduced a certified copy of respondent's (1) 1987 conviction for criminal sexual abuse of Sheri, and (2) 2002 conviction for criminal sexual abuse of Ashley, who was 13 years old. Pursuant to *Allen*, this evidence alone was sufficient to prove respondent had demonstrated propensities toward acts of sexual assault. Contrary to respondent's claim, the State did not rely on witnesses who "relied upon both hearsay reports which were inadmissible." As discussed in our analysis above, Drs. Killian and Jeckel were entitled to rely upon, and testify to, the contents of the documents which they reviewed in preparing their reports. Nevertheless, our supreme court in *Allen* held that the State sufficiently satisfies its burden of proving a respondent's propensities by proving respondent committed at least one act of sexual assault or molestation. *Allen*, 107 Ill. 2d at 105. The certified copies of respondent's convictions introduced into evidence satisfied the State's obligation.

¶ 47      Respondent also claims the State failed to put forth sufficient evidence to prove the fifth proposition, that it was substantially probable respondent will engage in the commission of sex offenses in the future if not confined. He contends the experts' testimony was "unsatisfactory and clearly a reasonable doubt existed as to the fifth proposition." He claims the experts are unable to predict the future and therefore, cannot determine beyond a reasonable doubt that respondent *will* engage in the commission of sex offenses in the future if not confined.

¶ 48      On this subject, this court has stated:

"While 'the statute is primarily concerned with prediction of the defendant's future conduct' (*Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697), the statute does not require proof that anything 'will' happen in the future. As respondent pointed out at trial, it is impossible to prove what 'will' happen in the future. The State need only prove the respondent has demonstrated his propensity to commit acts. Having a propensity to commit acts necessarily implies that the propensity will be acted upon in the future." *People v. Hancock*, 329 Ill. App. 3d 367, 377 (2002).

¶ 49      The testimony of both well-qualified experts supported the State's claim that it was substantially probable that respondent would reoffend if he was not confined. Each expert stated his opinion to this effect based on his respective review of the documentary evidence and his personal interview with respondent. Dr. Killian relied on three actuarial instruments in determining respondent's likelihood of reoffending. He believed these instruments provided a reliable assessment of the risk. Coupled with his interview, his diagnosis of respondent's mental disorder, and his review of the documents provided, he opined with reasonable certainty (a stated 90% certainty) that it was substantially probable that respondent would commit a sex offense in the future if not confined.

¶ 50      Dr. Jeckel noted respondent's pattern of surprising and "blitzing" his victims with aggression, as well as his practice of portraying the victims as the aggressors and himself as a victim. He concluded that these characteristics, coupled with his observations from the

clinical interview of respondent and his review of the documents, supported his opinion that he too believed it was substantially probable that respondent would reoffend if not confined.

¶ 51    We conclude, based on the evidence presented at trial, any reasonable jury could have found the elements sufficiently proved to determine respondent was a sexually dangerous person. The evidence was not so improbable as to raise a reasonable doubt. See *Bailey*, 405 Ill. App. 3d at 171.

¶ 52                                    III. CONCLUSION

¶ 53    For the foregoing reasons, we affirm the trial court's judgment.

¶ 54    Affirmed.