NOTICE
Decision filed 07/09/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 160191

NO. 5-16-0191

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wayne County. |
| | ) | |
| v. | ) | Nos. 15-CF-150, 15-CF-153, |
| | ) | 15-CF-154 |
| | ) | |
| THOMAS W. BELANGER, | ) | Honorable |
| | ) | Michael J. Molt, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial, the defendant, Thomas Belanger, was declared a sexually dangerous person (SDP) under the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 *et seq.* (West 2014)) and committed to the custody of the Illinois Department of Corrections (IDOC) for care and treatment. On appeal, the defendant argues that the State failed to prove beyond a reasonable doubt the he was an SDP. We affirm.

¶ 2                                    I. Background

¶ 3    In August 2015, the defendant was charged with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2014)), one count of aggravated assault (720 ILCS 5/12-2(c)(1) (West 2014)), two counts of unlawful restraint (720 ILCS 5/10-3(a) (West 2014)), and three

1

counts of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2014)). The criminal sexual assault charge alleged that the defendant committed an act of sexual penetration by the use of force against his fifth wife, D.B. The defendant later entered not guilty pleas to all charges.

¶ 4 While charges were pending, the State filed a petition to proceed and for evaluations in lieu of criminal prosecution under the Act. The State alleged that the defendant had an extensive criminal history that included the following: aggravated battery and sexual assault in 1989 of S.E., a 14-month-old family member, where the defendant stomped on her pubic area and anally raped her; escape and theft of a motor vehicle in 1990; aggravated battery and sexual assault in 2002, where the defendant tied up a man and anally penetrated him with a broomstick; and multiple acts of sexual violence against D.B., including one incident where he gagged her with a bandana, bound her hands, forced her to kneel while he beat her with a belt, and then raped her.

¶ 5 The Wayne County circuit court appointed Dr. Daniel Cuneo, a licensed clinical psychologist, and Dr. Angeline Stanislaus, a forensic psychiatrist, to conduct independent examinations of the defendant and render separate opinions on whether the defendant qualified as an SDP, as defined by the Act. Following the evaluations, the State filed a petition to declare the defendant an SDP, pursuant to the Act. The petition alleged that both Drs. Cuneo and Stanislaus had concluded within a reasonable degree of medical and psychiatric certainty that the defendant met the criteria as an SDP. The petition also alleged that the defendant suffered from a qualifying mental disorder for at least one year prior to the filing of the petition, that he had criminal propensities to commit sex offenses and acts of sexual molestation of children, that he had demonstrated criminal propensity by his past actions, and that he was substantially likely to

2

engage in future acts of sexual violence if not confined. Prior to trial on the State's petition, the defendant waived his right to a jury trial.

¶ 6                           A. Dr. Cuneo

¶ 7      In April 2016, the defendant's bench trial was held. Dr. Cuneo, the State's first expert witness, testified to the following. Dr. Cuneo was a licensed clinical psychologist primarily employed by the court systems in multiple counties throughout southern Illinois. Dr. Cuneo had conducted numerous sex offender risk assessments and sexually violent person evaluations but acknowledged that the defendant's case was his first SDP evaluation. In preparing the defendant's evaluation, Dr. Cuneo had referenced the defendant's clinical and mental health records, criminal history, social history, and prior fitness evaluations.

¶ 8      Dr. Cuneo first conducted a mental status examination of the defendant to determine whether the defendant suffered from the requisite mental disorder. In doing so, he initially determined whether the defendant was feigning symptoms or responding truthfully to his inquiries by primarily relying on the defendant's documented mental health history. Dr. Cuneo testified that the defendant had "admitted every psychiatric symptom posed to him" and claimed to have suffered from hallucinations since childhood, which Dr. Cuneo noted was inconsistent with the defendant's mental health records. According to Dr. Cuneo, the defendant's mental health records, dating back to 1975, revealed that the defendant had always denied experiencing hallucinations. Dr. Cuneo concluded that the defendant's thinking was "somewhat paranoid in nature" but not delusional. Moreover, Dr. Cuneo noted that the defendant's past mental health treatments had been intertwined with the defendant's criminal activities, which Dr. Cuneo explained was particularly important because the defendant never voluntarily sought treatment unless legally required.

¶ 9 Dr. Cuneo also addressed the defendant's mood disorders. Often, the defendant would turn his "anger inward" and then become depressed and suicidal. In fact, the defendant told Dr. Cuneo that he had attempted suicide over 100 times, which was consistent with his previous hospitalization records. Additionally, the defendant's clinical records showed numerous examples where he turned his anger outward and lashed out toward others with rage. In particular, the defendant admitted that he had attempted to kill the boyfriend of his ex-wife, A.B., with a baseball bat, broken A.B.'s jaw, and sexually abused her for several hours. The defendant also greased a broomstick and forcibly inserted it into a restrained victim's anus. Moreover, the defendant beat and anally raped S.E., a 14-month-old family member.

¶ 10 Dr. Cuneo also addressed the defendant's history of substance abuse. According to research, Dr. Cuneo testified that mentally ill individuals who abuse substances were five times more dangerous. Dr. Cuneo noted that the defendant "repeatedly attempted to self-medicate with alcohol and drugs as a means to deal with his mood swings" and that "these substances dominated [the defendant's] life." In fact, the defendant had a long history of alcohol and substance use, which impaired his impulse control and greatly increased his "probability of dangerousness." In particular, the defendant had admitted to using cocaine before he beat and raped S.E. in 1989. Despite the defendant's long criminal history, he had failed to seek substance abuse treatment. Furthermore, according to Dr. Cuneo, the defendant had a history of "interlocking" sex and violence, specifically that the defendant's five failed marriages each contained domestic violence.

¶ 11 Upon completion of his evaluation, Dr. Cuneo opined, to a reasonable degree of psychiatric certainty, that the defendant was an SDP. Dr. Cuneo diagnosed the defendant with (1) personality disorder, not otherwise specified (NOS); (2) sexual sadism disorder (SSD), which

4

had been present for over 30 years, starting in 1985; (3) alcohol, cannabis, and cocaine dependency in a controlled environment; and (4) learning disorder, NOS. Dr. Cuneo explained that the defendant's criminal activity and past statements demonstrated that he became sexually aroused through violence and rage and that he had a mental disorder for purposes of the Act.

¶ 12 Dr. Cuneo next addressed the defendant's inability to control his behavior and the likelihood that, if not confined, he would engage in future sex offenses. The defendant had a personality disorder, both borderline and antisocial, which showed a lack of empathy and "a certain amount of psychopathy." Dr. Cuneo had administered the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), which determined that the defendant had a 73% chance of reoffending in the next five years. Thus, given the defendant's propensity to commit sexual offenses, Dr. Cuneo concluded that it was very likely that the defendant would reoffend in the future.

¶ 13 Although Dr. Cuneo acknowledged on cross-examination that the defendant did not reoffend in prison from 2003 to 2013, Dr. Cuneo explained that a trigger for the defendant was the use of alcohol and drugs, which was missing during the defendant's incarceration. Dr. Cuneo further explained that an individual's inability to control sadistic behavior in certain situations was not part of the definition of SSD. In particular, Dr. Cuneo stated that someone "can be a sexual sadist and still control [their] actions." Dr. Cuneo further explained that if you give an individual with sexual sadism "an opportunity to prey on victims, and I give him the opportunity to drink *** to use a little meth and to use a little coke *** that's going to screw up your impulse control, his potential for violence is going to go through the ceiling." Thus, Dr. Cuneo concluded that the probability of reoffending was greatly increased by the defendant's lengthy violent history and his personality disorder combined with the use of alcohol and drugs.

5

¶ 14                                B. Dr. Stanislaus

¶ 15    Dr. Stanislaus, the State's second expert witness, testified to the following. Dr. Stanislaus was an expert forensic psychiatrist in the area of sex offender evaluation, including diagnosis and risk assessment; a licensed medical doctor; and chief medical director for the Missouri Department of Mental Health. As part of her professional experience, Dr. Stanislaus had performed more than 20 initial SDP evaluations and over 200 recovery SDP evaluations assessing whether an individual was still sexually dangerous.

¶ 16    Dr. Stanislaus addressed her process used to perform the defendant's SDP evaluation. Dr. Stanislaus reviewed the defendant's criminal history and investigative reports associated with his previous sex offenses, prior fitness evaluations, and treatment records from IDOC. Dr. Stanislaus then interviewed the defendant for approximately 90 minutes. When Dr. Stanislaus asked the defendant to explain the events surrounding the beating and rape of S.E., the defendant stated that S.E. had fallen off of a bed and broken her legs. The defendant provided no other details of the event. Dr. Stanislaus noted that the defendant's explanation was inconsistent with police reports. In fact, records demonstrated that the defendant had angrily thrown S.E. on the floor and stomped on her before he anally raped her. The medical records showed that S.E.'s arms and legs were fractured, and there were signs that she had suffered prior fractures several months before. Additionally, S.E. had anal dilation with internal and external bruising, and she had blood in her urine and vagina. The defendant was later convicted and sentenced to 12 years in prison. After his release, he reoffended in 2002.

¶ 17    Next, Dr. Stanislaus discussed the defendant's 2002 conviction for sexual assault. In particular, the defendant's act of greasing a broomstick and forcibly inserting it into the victim's anus, while the victim was tied to a bed, demonstrated another act of sexual violence. Dr.

6

Stanislaus noted that the defendant was convicted and sentenced to eight years in prison. Following his release and discharge from IDOC in 2012, the defendant committed additional acts of sexual violence, which included multiple sexual assaults of D.B. in 2015.

¶ 18 Next, Dr. Stanislaus discussed the defendant's 2015 sexual assaults of D.B., noting that they were "quite significant" in arriving at a diagnosis, as they had all occurred after D.B. had refused the defendant's sexual advances. In May 2014, the defendant broke D.B.'s nose after he forcibly pressed his hands on her nose. Additionally, in January 2015, he sexually assaulted D.B. where he gagged her, tied her hands, forced her to kneel, and then beat her with a belt and raped her.

¶ 19 Dr. Stanislaus also addressed the defendant's nonsexual criminal history that started when he was convicted of burglary at the age of 17. Within one year, the defendant had violated his probation by committing additional burglary and theft offenses. After he finished a three-year prison sentence, the defendant returned to prison following numerous parole violations. Following his release, the defendant was convicted and sentenced to prison for three years for intimidation, aggravated assault, criminal damage to property, and resisting a peace officer. In 1990, while in custody for the 1989 sexual assault of S.E., the defendant escaped from jail and stole a vehicle. He was subsequently convicted and sentenced to five years in prison on the escape and theft of motor vehicle offenses. Dr. Stanislaus explained that these crimes and the defendant's violations of probation and parole did not involve sexual acts but were still relevant to the SDP evaluation for two reasons. First, the presence of "more criminal behaviors in a sex offender increases sexual recidivism." Second, it "talks about [the defendant's] personality disorder, which is antisocial personality disorder where he has difficulty following rules and confining [*sic*] to the norms of society."

7

¶ 20    Dr. Stanislaus also considered the defendant's alcohol and substance abuse and his social history. According to Dr. Stanislaus, the defendant had a propensity to commit sex offenses, and the use of drugs enabled him to act on his sexual urges. When asked whether the defendant's lack of reoffending in prison was important, Dr. Stanislaus explained that the defendant was in a "contained environment" and "intensively supervised and monitored" while incarcerated. This 10-year period was unimportant to her because the defendant was not in the community and had demonstrated that he would reoffend upon release several times. Dr. Stanislaus also explained that the defendant had numerous failed marriages, all involving domestic violence. According to Dr. Stanislaus, the defendant's social history and poor functioning ability increased his risk level of "reengaging" in sexual violence.

¶ 21    Similar to Dr. Cuneo, Dr. Stanislaus opined, to a reasonable degree of psychiatric certainty, that the defendant was an SDP and, if not confined, it was substantially probable that he would reoffend in the future. Dr. Stanislaus diagnosed the defendant with sexual sadism because he became intensely sexually aroused when nonconsenting persons physically or psychologically suffered; antisocial personality disorder, which was exhibited by the defendant's callousness, lack of remorse, and inability to value the rights of others; and other psychotic disorders. She explained that the defendant's mental disorders affected his volitional capacity and increased his propensity to commit sexual offenses. Lastly, after conducting a Static-99 risk analysis, she concluded that the defendant's likelihood to reoffend was 2.7 times greater than the typical sex offender.

¶ 22                                            C. D.B.

¶ 23    D.B. testified to the following. D.B. started dating the defendant in March 2014, and the two were married on May 23, 2014. Three days later, after she refused the defendant sex, he

pressed his hands over her nose, preventing her from breathing for 30 to 45 seconds, until her nose bled. She sought medical treatment at a local hospital several days later where it was determined that her nose was broken. According to D.B., when she refused to perform oral sex, which he demanded nearly every day, he "smack[ed]" her until she complied. When she did perform oral sex on him, the defendant forced her head down until she could not breathe. D.B. recounted several instances where he called her a whore and strangled her after she refused to have sex. When D.B. and the defendant did have sex, it sometimes started as consensual, but he would often force her to have anal sex. In fact, she explained that the defendant "ejaculated much quicker" during violent, nonconsensual sexual acts. Lastly, in January 2015, he used a bandana to gag her, bound her hands and forced her into a kneeling position, and then beat her with a belt and raped her.

¶ 24    During the trial, the State admitted certified copies of the defendant's prior convictions and presented police officer testimony regarding the defendant's admissions during the corresponding investigations. The circuit court found that the State had proven beyond a reasonable doubt that the defendant was an SDP, as defined by the Act. The court committed the defendant to the custody of IDOC for care and treatment. On August 27, 2016, the defendant filed a motion for new trial, which the court denied. The defendant filed a timely notice of appeal.

¶ 25                                II. Analysis

¶ 26    The sole issue on appeal is whether the State failed to prove beyond a reasonable doubt that the defendant met the criteria of an SDP. In particular, the defendant asserts that the State failed to meet its burden where evidence showed that he failed to commit a single act of sexual

9

sadism while incarcerated for 10 years. In support, the defendant alleges that he "controlled himself for at least a decade."

¶ 27                          A. Appellate Brief Requirements

¶ 28    Prior to addressing the issues raised in this appeal, we observe *sua sponte* that the defendant's brief fails to comply with numerous provisions of Illinois Supreme Court Rule 341 (eff. Nov. 1, 2017) pertaining to form and substance. The supreme court rules governing appellate briefs are not mere suggestions but are compulsory. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. The purpose of these rules is to require the parties to present clear and orderly arguments before a reviewing court, so that the court can properly ascertain and dispose of the issues involved. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal. *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005).

¶ 29    Specifically, the defendant's brief lacks a certificate of compliance certifying "that the brief complies with the form and length requirements of paragraphs (a) and (b)" of Illinois Supreme Court Rule 341(c) (eff. Nov. 1, 2017) and a certificate of service, pursuant to Illinois Supreme Court Rule 341(e) (eff. Nov. 1, 2017). Additionally, Rule 341(h) requires that the appellant's brief contain the following parts: a summary statement entitled "Points and Authorities" (Ill. S. Ct. R. 341(h)(1) (eff. Nov. 1, 2017)); "[a]n introductory paragraph stating (i) the nature of the action and of the judgment appealed from and whether the judgment is based upon the verdict of a jury, and (ii) whether any question is raised on the pleadings and, if so, the nature of the question" (Ill. S. Ct. R. 341(h)(2)(i), (ii) (eff. Nov. 1, 2017)); "a concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion

in the argument" (Ill. S. Ct. R. 341(h)(3) (eff. Nov. 1, 2017)); and a statement of jurisdiction (Ill. S. Ct. R. 341(h)(4)(ii) (eff. Nov. 1, 2017)). The defendant failed to comply with these above-mentioned requirements.

¶ 30     Moreover, the defendant's brief and reply brief contain numerous typographical errors, misspellings, and factual inaccuracies. For example, the first sentence of the facts section states that the Illinois Attorney General's Office filed the petition to proceed and for evaluation under the Act. However, the record clearly shows that the Wayne County State's Attorney filed the petition and was assisted at trial by a member of the Illinois State Appellate Prosecutor's Office. In addition, in the argument section, the defendant states that "both doctors also admitted that Respondent did not meet one of the qualifications for a diagnosis of sexual sadism." This statement is not supported by page references where this evidence appears in the record and, in fact, is not supported by the record. Lastly, we note that the requested legal remedy is inconsistent throughout the defendant's brief, where he at times requests this court to vacate and, at other times, reverse the circuit court's order.

¶ 31     Although this court has the authority to dismiss this appeal for noncompliance, the deficiencies do not preclude our ability to review the issues. See *Spangenberg v. Verner*, 321 Ill. App. 3d 429, 432 (2001) (declining to strike brief where it complied with rules in other ways and none of violations were so flagrant as to hinder or preclude review). We admonish, however, the defendant's appellate counsel to follow the supreme court rule requirements and to refrain from overstating facts in future submissions. We now turn to the merits of the appeal.

¶ 32                              B. Sexually Dangerous Person

¶ 33     The State has the burden to prove beyond a reasonable doubt that a defendant is an SDP. 725 ILCS 205/3.01 (West 2014). Under section 1.01 of the Act, an SDP is defined as follows:

11

"All persons [1] suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with [2] criminal propensities to the commission of sex offenses, and [3] who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***." 725 ILCS 205/1.01 (West 2014).

Our supreme court has construed the term " 'mental disorder,' as used in the [Act], to mean a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior." *People v. Masterson*, 207 Ill. 2d 305, 329 (2003). "Thus, a finding of sexual dangerousness premised upon the elements of section 1.01 of the [Act] [citation] must hereafter be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Masterson*, 207 Ill. 2d at 330. While proceedings under the Act are civil in nature, the State's burden of proof is beyond a reasonable doubt. 725 ILCS 205/3.01 (West 2014).

¶ 34 Since a circuit court's finding that a defendant was an SDP is one of fact, a "reviewing court will affirm the judgment, after considering all of the evidence introduced at trial in the light most favorable to the State, if it determines that any rational trier of fact could have found the essential elements to be proved beyond a reasonable doubt." *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 44. Moreover, a reviewing court will not substitute its judgment, " 'unless the evidence is so improbable as to raise a reasonable doubt that the defendant is a sexually dangerous person.' " *Hunter*, 2013 IL App (4th) 120299, ¶ 44 (quoting *People v. Bailey*, 405 Ill. App. 3d 154, 171 (2010)).

12

¶ 35    On appeal, the defendant argues that both Drs. Cuneo and Stanislaus admitted that he did not meet one of the qualifications for a diagnosis of sexual sadism and each testified that he did not commit any acts of sexual sadism for more than 10 years while he was incarcerated. However, the record more precisely demonstrates that Drs. Cuneo and Stanislaus diagnosed the defendant with SSD and antisocial personality disorder, even though there was no proof that the defendant committed acts of sexual sadism while incarcerated. In particular, Dr. Cuneo testified that someone "can be a sexual sadist and still control [their] actions." Additionally, Dr. Cuneo explained that whether an individual was able to control his or her sadistic behavior in certain situations—here, prison—was not an element of SSD. Similarly, Dr. Stanislaus explained that the defendant was in a "contained environment" and "intensively supervised and monitored" while incarcerated. Moreover, even though the defendant did not reoffend while incarcerated, Dr. Stanislaus emphasized that his criminal records showed that he had reoffended immediately following his release from prison on several occasions.

¶ 36    Additionally, Drs. Cuneo and Stanislaus both opined, to a reasonable degree of medical and psychiatric certainty, that it was substantially probable that, if not confined, the defendant would engage in future sex offenses. According to both expert doctors, the likelihood of the defendant reoffending was greater when opportunities, such as alcohol or drugs, were present, which the defendant could not access during his incarceration. Moreover, both doctors administered statistical tests to determine the defendant's likelihood of reoffending. Following Dr. Cuneo's administration of the MnSOST-R screening tool, he determined that there was a 73% chance that the defendant would reoffend within five years. Dr. Stanislaus conducted a Static-99 risk analysis and concluded that the defendant's likelihood to reoffend was 2.7 times greater than the typical sex offender. As such, the record demonstrates that the circuit court

13

found the unrebutted testimonies of Drs. Cuneo and Stanislaus credible, as they were well qualified and reasoned in their conclusions. See *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11 (2001) (trial court was responsible for assessing witness credibility, resolving conflicts in evidence, and drawing reasonable inferences from the evidence).

¶ 37 After considering the record in its entirety, we conclude that the circuit court could have reasonably found that the State proved beyond a reasonable doubt that the defendant met the criteria of an SDP under the Act. As stated in detail above, there was overwhelming evidence to support the expert doctors' opinions that the defendant suffered from SSD and antisocial personality disorder, which affected his emotional and volitional capacity and predisposed him to engage in the commission of sex offenses. Additionally, the evidence strongly supports the court's conclusion that it was substantially probable that, if not confined, the defendant would engage in the commission of future sex offenses.

¶ 38                                 III. Conclusion

¶ 39 For the reasons stated, we affirm the circuit court of Wayne County finding the defendant an SDP and committing him to the custody of the IDOC for care and treatment.

¶ 40 Affirmed.

2018 IL App (5th) 160191

NO. 5-16-0191

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wayne County. |
| | ) | |
| v. | ) | Nos. 15-CF-150, 15-CF-153, |
| | ) | 15-CF-154 |
| | ) | |
| THOMAS W. BELANGER, | ) | Honorable |
| | ) | Michael J. Molt, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

**Opinion Filed:** July 9, 2018

---

| | |
|---|---|
| **Justices:** | Honorable John B. Barberis, P.J. |
| | Honorable Judy L. Cates, J., and |
| | Honorable James R. Moore, J., |
| | Concur |

---

| | |
|---|---|
| **Attorney for Appellant** | Paige Clark Strawn, Law Office of Paige Clark Strawn, P.C., 1003 Broadway, P.O. Box 1643, Mt. Vernon, IL 62864 |

---

| | |
|---|---|
| **Attorneys for Appellee** | Hon. Kevin Kakac, State's Attorney, Wayne County Courthouse, Fairfield, IL 62837; Patrick Delfino, Director, Patrick D. Daly, Deputy Director, Kelly M. Stacey, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864 |

---