# Illinois Official Reports

## Appellate Court

***People v. Howe*, 2014 IL App (4th) 140054**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES G. HOWE, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0054 |
| Filed | November 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's finding that defendant was a sexually dangerous person was upheld on appeal over defendant's contentions that the trial court erred in denying his motion for a mistrial based on the *Brady* violation that occurred when a statement of a prosecution witness that was favorable to defendant was not disclosed until the third day of defendant's trial and prejudiced him by preventing the experts from reviewing the discrepancy in the witness's statements and that the evidence did not support the finding that he was a sexually dangerous person, since there was no *Brady* violation where defendant was given wide latitude in examining the witness and the deputy who took the statement and the trial court had the witness's explanation for the discrepancy between her statements and the reason for her delayed disclosure before it prior to making its decision, and the evidence, considered in the light most favorable to the State, including the testimony of two psychiatrists, established beyond a reasonable doubt that defendant suffered from a mental disorder for more than one year prior to the filing of the petition that warranted confinement under the Act. |
| Decision Under Review | Appeal from the Circuit Court of Scott County, No. 12-CF-9; the Hon. John Schmidt, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on          William A. Davis II (argued), of Brown, Hay & Stephens, LLP, of
Appeal              Springfield, for appellant.

                    Michael Hill, State's Attorney, of Winchester (Patrick Delfino, David
                    J. Robinson, and James C. Majors (argued), all of State's Attorneys
                    Appellate Prosecutor's Office, of counsel), for the People.

Panel               JUSTICE TURNER delivered the judgment of the court, with opinion.
                    Presiding Justice Appleton and Justice Knecht concurred in the
                    judgment and opinion.

## OPINION

¶ 1    In January 2013, the State filed a petition to have defendant, James G. Howe, declared a sexually dangerous person. In October 2013, the trial court found defendant to be a sexually dangerous person. In November 2013, defendant filed a posttrial motion, which the court denied.

¶ 2    On appeal, defendant argues the trial court erred in (1) denying his motion for mistrial and (2) finding him to be a sexually dangerous person. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    In July 2012, the State filed an amended information, charging defendant with the offenses of aggravated criminal sexual assault (counts I and II) (720 ILCS 5/11-1.30(a)(4) (West 2010)) and domestic battery (count III) (720 ILCS 5/12-3.2(a)(2) (West 2010)) of Lisa Howe, now known as Lisa Riffey, on or about December 11, 2011. In October 2012, the State filed a petition to proceed and for evaluations under the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 to 12 (West 2012)). Examination reports were filed by two psychiatrists, Dr. Terry Killian and Dr. Lawrence Jeckel.

¶ 5    In January 2013, the State filed a petition to have defendant declared a sexually dangerous person. The State alleged defendant had been examined by Drs. Killian and Jeckel, both of whom concluded to a reasonable degree of medical and psychiatric certainty that defendant satisfied the criteria for being declared a sexually dangerous person.

¶ 6    In April 2013, defendant filed a motion for appointment of a defense expert. In June 2013, the trial court granted the motion and, pursuant to defense counsel's suggestion, ordered Dr. Kirk Witherspoon, a licensed clinical psychologist, to conduct an evaluation.

¶ 7    In October 2013, defendant's bench trial on the petition commenced. Dr. Killian's report indicated he reviewed 670 pages of documents, including police reports, and interviewed defendant for just under two hours. Killian also reviewed defendant's criminal history, including an incident in 2002, where it was alleged the 22-year-old defendant raped K.F., a

- 2 -

16-year-old girl. Defendant denied having sex with her, but his deoxyribonucleic acid (DNA) evidence matched that found on the victim. Defendant pleaded guilty to criminal sexual abuse.

¶ 8    Another incident occurred in 2005 with S.B. At a New Year's Eve party, S.B. stated she fell asleep in a recliner. When she awoke, her legs were spread and her pants and underwear were pulled down. She also noticed a discharge coming from her vaginal area and suspected defendant. She went to the police and then the hospital. DNA evidence matched defendant's. Dr. Killian stated defendant admitted he had sex with S.B. but claimed it was consensual and "largely initiated by her." No charges were filed.

¶ 9    In December 2011, an incident allegedly occurred between defendant and his estranged wife, Lisa Riffey. Dr. Killian stated Riffey claimed defendant raped her and threatened to harm her. Defendant denied having raped her. He claimed she had performed oral sex on him and then they had consensual sex. While he was taking a shower, he overheard her "talking hatefully." She called the police, which defendant claimed was in response to his filing for divorce. Killian reported that during the investigation of the December 2011 offense, Riffey provided a statement in June 2012 that defendant sexually assaulted her in April 2011.

¶ 10   Dr. Killian administered the Minnesota Sex Offender Screening Tool-revised (MnSOST-R), and defendant's score of four placed him in the category of moderate risk. On the Static 99 test, defendant also achieved a score of four, placing him in the moderate risk category. In his report, Killian stated "the only disorder that I can give Mr. Howe with any reasonable degree of psychiatric certainty is probable personality disorder with antisocial features." Killian also found defendant has "certainly demonstrated propensities toward acts of sexual assault as part of the wider pattern of his antisocial behavior."

¶ 11   In his testimony, Dr. Killian stated defendant has a "pretty strong history of substance dependence" with multiple substances and "very likely a personality disorder with antisocial features." Based on a reasonable degree of medical and psychiatric certainty, Killian opined defendant was "substantially likely to reoffend sexually, as well as non-sexually, if not confined."

¶ 12   On cross-examination, Dr. Killian testified that his opinion would "likely" be different if the alleged offenses, *i.e.*, those other than the one involving K.F., were untrue, as it would "lower the risk" in his mind. When defense counsel asked Killian about his report containing "no firm diagnosis of any mental disorder," Killian responded as follows:

> "I'm thinking about the phrasing of the question. If I can say not a definitive in that, as I explained earlier, everything that I see in Mr. Howe suggests very strongly antisocial personality disorder. The DSM-IV [Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition] criteria specifically require a history of conduct disorder or behavior that would warrant a diagnosis, conduct disorder before the age of 15 and I don't specifically have that. So to make a definitive DSM-IV diagnosis of antisocial personality disorder, I can't with the information I have. So what I wrote down is probable personality disorder with antisocial features. So it's not definitive."

¶ 13   In his evaluation of defendant, Dr. Jeckel indicated he reviewed documents, including police reports, and conducted a two-hour interview with him. Jeckel relayed details of the alleged December 2011 incident in a similar fashion as Dr. Killian. Jeckel also made a brief reference to Riffey's claim that a "prior domestic dispute" took place in April 2011 when "forced sex" occurred. Defendant explained that he is the victim of "problem women," *i.e.*,

those who cheat on him, assault him, or stab him. Jeckel's report indicates defendant scored a five on the Static 99 tool, putting him in the moderate to high risk category. On the MnSOST-R, defendant scored a two, placing him in the low risk category for recidivism. In his report, Jeckel opined that defendant "has shown himself to be an aggressive and violent man in a number of situations" and his disorders affect his "emotional and volitional capacity and, therefore, result in an inability to control his violent and sexual impulses."

¶ 14 In his report, Dr. Jeckel found, to a reasonable degree of medical and psychiatric certainty, that defendant fulfilled the criteria for the mental disorders of alcohol and cannabis abuse in addition to a personality disorder, not otherwise specified, with antisocial features, which "predisposes him to engage in recurrent aggressive and/or violent sexual activity with women which he has denied to authorities." Based on his history, Dr. Jeckel believed defendant's personality disorder predisposed him to sexual violence and he should be declared a sexually dangerous person.

¶ 15 Leah Childers testified she had an on-again, off-again relationship with defendant for approximately eight years. She recited instances of domestic violence by defendant and seeking multiple orders of protection against him. When the two were out in Virginia in 1997 or 1998, Childers stated defendant performed anal sex without her consent. In 2002, defendant engaged in vaginal intercourse without her consent while she had a stint in place that made sexual activity "very uncomfortable."

¶ 16 Kimberly Waid testified she was defendant's girlfriend for five or six months in 2006 and 2007. She testified to an incident of domestic violence in March 2007, where defendant became "really angry" and told her the only way she was leaving the house "was in a body bag." Waid wanted to leave the residence, but defendant started shoving her and tried to keep her from leaving. Waid stated she was injured and went to the hospital and then the police station. Waid obtained an order of protection against defendant.

¶ 17 S.B. testified to the offense that allegedly took place on December 31, 2005. She attended a party with her fiancé at a Springfield apartment shared by defendant and another male. S.B.'s fiancé passed out, and the three others went into the host's bedroom. While the host was looking at pornography on the computer, defendant began rubbing S.B.'s back, and she attempted to "shrug him off." They left the bedroom and started to watch a movie. Defendant passed out on the couch. S.B. passed out in a recliner "halfway" through the movie. S.B. awoke the next morning, and she was covered in a comforter. She stated her pants and underwear were down at her ankles and there was a "discharge" coming out of her vagina. She woke up the host and told him she thought she had been raped. After waking her fiancé and talking it over, she went to the hospital. She testified she did not agree to have sex with anyone that evening.

¶ 18 Lisa Riffey testified she was married to defendant from 2010 to 2012. On December 11, 2011, a time when Riffey and defendant were separated, Riffey was awakened in the morning when her bedroom door was kicked in. Defendant got in her face and demanded to know where his "hitter box," an item of drug paraphernalia, was located. Defendant became angry when Riffey said she did not know. He then punched her in the head, pulled her hair, and pulled her to the side of the bed. He stuck his penis in her mouth. As Riffey tried to scream, defendant put his hand over her mouth. He then opened her robe, held her arms over her head, and inserted his penis inside her vagina. Riffey stated she tried to squirm and fight, and defendant

eventually withdrew and ejaculated on her stomach. The police arrived later, but Riffey did not tell the officer what happened because she was scared.

¶ 19    Riffey also testified to an incident in April 2011, when defendant came after her with a knife. He told her she did not need to live, she needed to die, and she was a "no good bitch." While they were struggling on the floor, defendant stuck his fingers and then his penis in her vagina. Riffey stated she was able to find the knife and attempted to stab him. The police were called, and both Riffey and defendant were arrested. On cross-examination, Riffey stated she eventually asked that the charges against defendant relating to the April 2011 incident be dropped.

¶ 20    Dr. Witherspoon testified for the defense. In noting the screening tools utilized by Dr. Killian and Dr. Jeckel, Witherspoon contended the Static 99 and MnSOST-R were out of date, unreliable, and no more accurate than a coin toss in the classification of risk. Witherspoon's evaluations led him to conclude that defendant's risk of reoffending was "negligible." Based on his assessments, he opined defendant "does not have sexual psychopathology." Instead, defendant had "mild personality disorder traits, which are somewhat antisocial and somewhat borderline." Witherspoon also stated defendant "has had historically substance abuse problems in the moderate overuse of alcohol and cannabis, primarily." Witherspoon was unable to diagnose defendant with a mental disorder that would qualify under the Act. He thought he might have an adjustment disorder; alcohol and cannabis use disorder, in remission; and a personality disorder. Based on a reasonable degree of certainty, Witherspoon opined defendant did not meet the criteria to be found a sexually dangerous person because he did not have the "requisite mental disorder" and did not have "the level of risk consistent with that."

¶ 21    The defense called Scott County sheriff's deputy Robyn Gourley regarding the April 2011 incident between Riffey and defendant. Gourley arrived and observed defendant with a wound on his leg that was bleeding. Gourley spoke with Riffey and obtained a written statement from her. During arguments on an evidentiary objection, defense counsel indicated he had not been provided with Riffey's statement as part of discovery and did not have it when he cross-examined her earlier. The following exchange then occurred:

"MS. LAMKEN [(prosecutor)]: He has [Riffey's] statement in December.

MR. COONROD [(defense counsel)]: There were two, Your Honor. And the second one that I had was consistent with the testimony. But low and behold, there's a first one that's not, that I received today.

MS. LAMKEN: Not low and behold. He came to us earlier today and said can I have the reports from April 4th.

MR. COONROD: Which I didn't get before.

MS. LAMKEN: He never asked for them. That was not part of the original sexual assault case in December.

MR. COONROD: And I can't–

MS. LAMKEN: We went and [photocopied] them and gave them to him.

THE COURT: So we have a statement of the witness that took the stand that was known to the prosecution but wasn't turned over to the defense because he didn't ask for it?

MS. LAMKEN: Judge, we're here on the sexually dangerous person, we had the file from the aggravated criminal sexual abuse, which is the case that's pending. There

is no case pending out of this. There has [*sic*] been many incidents between them. And no, we had not went [*sic*] and retrieved the April 4th police reports from 2011. We had not went [*sic*] and retrieved those. When defense counsel said he would like to see that file today, we went and [photocopied] it and gave it to him.

THE COURT: So there's a statement of a witness that takes the stand that the prosecution knows about but didn't disclose it because it wasn't asked for? Am I still on the same page there?

MS. LAMKEN: Well, my response is going to be: I did not know that she had made a written statement back in April. But I know that you're going to say that doesn't matter, so.

THE COURT: When is the first time you became aware that she had a written statement?

MS. LAMKEN: I saw it for the first time today.

THE COURT: That matters.

MS LAMKEN: But I understand that, obviously, it was in a police file. I believe it was in the State's Attorney's file downstairs because they looked at the case. The cases had been dismissed. So I assume Mr. Hill has seen it. I saw it for the first time today.

THE COURT: I understand. Here is the remedy, you're going to get a lot of latitude. Go ahead."

Defense counsel continued questioning Deputy Gourley on Riffey's written statement of April 4, 2011. Therein, Riffey did not make any reference to a sexual assault.

¶ 22    Deputy Gourley also came into contact with Riffey on December 11, 2011. Riffey came out of a residence and said there had been an argument. Gourley did not observe any injuries on her. When Gourley questioned Riffey about her statement that she was waiting for a friend to go to the hospital, Riffey explained she was not feeling well.

¶ 23    Defense counsel called Riffey to testify regarding the April 2011 incident and her written statement. On cross-examination, Riffey admitted she did not claim she had been raped in her statement but stated she refrained from doing so because defendant had threatened her.

¶ 24    At the conclusion of Riffey's testimony, defense counsel moved for a mistrial based on the State's failure to provide Riffey's April 4, 2011, statement. The trial court denied the motion, saying it had taken curative measures by allowing wide latitude in cross-examination.

¶ 25    Defendant testified he did not recall any incident of forced sex with Leah Childers. He testified to the New Year's Eve party he attended with S.B. and others. Defendant stated he was "drinking heavily" throughout the evening. He, S.B., and another male went into the bedroom and watched pornography on the computer. Defendant stated he engaged in consensual oral sex with S.B. in front of the web camera. After continued drinking and flirting, defendant fell asleep on the couch. When he awoke, he and S.B. went outside to smoke. Thereafter, they went back inside and "began fooling around." Defendant stated S.B. performed oral sex on him and then they had consensual sexual intercourse in the recliner. Once S.B.'s boyfriend awoke, defendant left.

¶ 26    Defendant also testified to the sexual contact with K.F. After drinking and smoking pot, defendant stated he and K.F. went up to his bedroom, undressed, and "began fooling around." He performed oral sex on K.F. When K.F. stated she had not yet been with another man and did not want to engage in intercourse, defendant stated he "laid down on the bed next to her." After

- 6 -

continued kissing and fondling, K.F. got on top of him and began "rubbing her vagina" on his penis. They did this for "some time," and, once finished, they went to sleep. Defendant testified the activity with K.F. was consensual.

¶ 27 When questioned by the State about the December 2011 incident with Riffey, defendant, over the State's objection, invoked his constitutional right not to incriminate himself. See U.S. Const., amend. V.

¶ 28 Following closing arguments, the trial court found the State proved beyond a reasonable doubt that defendant has a mental disorder and the disorder has existed more than one year prior to the filing of the petition. The court found the testimony of Dr. Killian to be "credible and compelling" and noted Killian found defendant was substantially likely to reoffend sexually. The court also noted Dr. Jeckel found defendant met the definition of a sexually dangerous person and his criminal and social history of losing control and engaging in acts of sexual violence predisposed him to commit further acts of sexual violence if not confined as a sexually dangerous person. The court found Dr. Witherspoon's testimony "unpersuasive," "unconvincing," and "not compelling."

¶ 29 The trial court also found the State proved beyond a reasonable doubt that defendant exhibits criminal propensities to the commission of sex offenses and demonstrated propensities toward acts of sexual assault. The court found the testimony of Childers, S.B., and Riffey to be credible and stated it provided "great insight" into the depth of defendant's sexual violence. The court noted the "commonality in the sexual assaults," including their "brutality," which the court found "shocking." In characterizing defendant as a "dangerous predator," the court found defendant's actions exhibited a "perverse sense of entitlement," in that defendant "has no concern for the lack of consent or feelings of his victims and only cares for his own gratification." The court found defendant's testimony to be "incredible," stating it amounted to a "constant stream of denials" and "clearly demonstrates his inability to accept responsibility for his actions."

¶ 30 The trial court found the State proved beyond a reasonable doubt all of the elements that defendant is a sexually dangerous person under the Act. The court also found beyond a reasonable doubt that the evidence proves it is substantially probable that defendant would engage in the commission of sex offenses in the future if not confined and defendant has serious difficulty controlling his sexual behavior. The court found defendant to be a sexually dangerous person and committed him to the custody of the Department of Corrections until he has recovered and is released as further provided by the Act.

¶ 31 In November 2013, defendant filed a posttrial motion, arguing the trial court erred in denying his motion for mistrial and in finding him to be a sexually dangerous person. In January 2014, the court denied the motion. This appeal followed.

¶ 32                                    II. ANALYSIS
¶ 33                              A. Motion for Mistrial
¶ 34 Defendant argues the trial court erred in not granting his motion for mistrial following the State's alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963), in regard to Riffey's written statement of April 4, 2011. We disagree.

¶ 35 "The decision to declare a mistrial lies within the discretion of the court, and a mistrial should be declared only if there is some occurrence at trial of such a character and magnitude

that the party seeking a mistrial is deprived of a fair trial." *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 49, 972 N.E.2d 667. The party moving for a mistrial bears the burden to show he has been prejudiced. *People v. Campbell*, 126 Ill. App. 3d 1028, 1036, 467 N.E.2d 1112, 1118 (1984).

¶ 36　　In arguing the trial court erred in not granting his motion for mistrial, defendant claims the State violated the requirement found in *Brady* when it failed to disclose Riffey's April 4, 2011, statement to the police until the third day of trial. Defendant contends none of the experts referred to the April 4, 2011, written statement in their testimony or reports. Defendant claims the statement was favorable for purpose of impeachment, and he was prejudiced because the experts had no opportunity to review the discrepancy with Riffey's reportings.

¶ 37　　Proceedings under the Act are civil in nature, and the Code of Civil Procedure (735 ILCS 5/1-101 to 22-105 (West 2012)) and Illinois Supreme Court Rules apply to all proceedings, except where otherwise provided in the Act. 725 ILCS 205/3.01 (West 2012). However, a defendant is entitled to some of the same procedural rights guaranteed in a criminal proceeding, such as the right to counsel, the right to a jury trial (725 ILCS 205/5 (West 2012)), and the requirement that the State prove him sexually dangerous beyond a reasonable doubt (725 ILCS 205/3.01 (West 2012)). Our supreme court has also noted "the right to due process entitles the defendant to the right to confront and cross-examine witnesses testifying against him, the right against self-incrimination and the right to a speedy trial." *People v. Trainor*, 196 Ill. 2d 318, 329, 752 N.E.2d 1055, 1061 (2001); see also *People v. Lawton*, 212 Ill. 2d 285, 295, 818 N.E.2d 326, 332 (2004). "These rights are conferred upon the defendant/respondent because, although the proceedings under the Act are civil in nature, they may result in deprivation of liberty and incarceration in the penitentiary for psychiatric treatment." *Trainor*, 196 Ill. 2d at 328, 752 N.E.2d at 1061.

¶ 38　　In *Brady*, the United States Supreme Court held the prosecution violates a defendant's constitutional right to due process by failing to produce evidence favorable to the accused and material to guilt or punishment. See *People v. Beaman*, 229 Ill. 2d 56, 73, 890 N.E.2d 500, 510 (2008).

>　　"A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. [Citation.] Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. [Citations.] To establish materiality, an accused must show ' "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." ' [Citation.]" *Beaman*, 229 Ill. 2d at 73-74, 890 N.E.2d at 510.

¶ 39　　The *Brady* rule is generally applied only in criminal cases. See *Millspaugh v. County Department of Public Welfare*, 937 F.2d 1172, 1175 n.† (7th Cir. 1991) (stating "[t]here is so far no parallel to *Brady* in civil litigation"); see also *United States ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 483 (D. Utah 2001) (declining to extend the application of *Brady* to a civil case brought under the False Claims Act); *Mister Discount Stockbrokers, Inc. v. Securities & Exchange Comm'n*, 768 F.2d 875, 878 (7th Cir. 1985) (rejecting application of *Brady* to a securities administrative disciplinary proceeding); *National Labor Relations Board v. Nueva Engineering, Inc.*, 761 F.2d 961, 969 (4th Cir. 1985) (rejecting application of *Brady*

to a National Labor Relations Board proceeding because it did not involve potential incarceration and a violation did not carry with it the stigma of a criminal conviction).

¶ 40 As defendant points out, no Illinois court has decided the issue of whether the *Brady* requirement applies to sexually dangerous persons petitions. However, courts in other jurisdictions have extended the *Brady* protections to civil cases in certain circumstances. See *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (holding "*Brady* should be extended to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against"); *United States v. Ebel*, 856 F. Supp. 2d 764, 766 (E.D.N.C. 2012) (applying *Brady* in a case involving civil commitment of a sexually dangerous person); *United States v. Edwards*, 777 F. Supp. 2d 985, 996 (E.D.N.C. 2011) (applying *Brady* in a case involving civil commitment of a sexually dangerous person).

¶ 41 As stated, our supreme court has found proceedings under the Act "may result in deprivation of liberty and incarceration in the penitentiary for psychiatric treatment." *Trainor*, 196 Ill. 2d at 328, 752 N.E.2d at 1061; see also *Lawton*, 212 Ill. 2d at 295, 818 N.E.2d at 332. Courts of other jurisdictions have made similar findings. See *Addington v. Texas*, 441 U.S. 418, 425 (1979) (stating "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *In re Detention of Morgan*, 330 P.3d 774, 779 (Wash. 2014) (stating "civil commitment is a significant deprivation of liberty"); *Gibson v. Commonwealth*, 756 S.E.2d 460, 462 (Va. 2014) (noting the deprivation of liberty in involuntary civil commitment cases); *State v. Floyd Y.*, 2 N.E.3d 204, 210 (N.Y. 2013) (stating "[t]he potential for indefinite confinement threatens a liberty interest of the highest order"); *In re S.J.*, 810 N.W.2d 720, 723 (Neb. 2012) (finding "[a] liberty interest is implicated if a subject is committed to inpatient treatment" as a dangerous sex offender).

¶ 42 Given the significant liberty interests at stake in cases under the Act, and considering "the importance of scrupulously ensuring the fairness of judicial proceedings that may result in indefinite commitment of a person determined to be sexually dangerous" (*People v. Antoine*, 286 Ill. App. 3d 920, 923, 676 N.E.2d 1374, 1376 (1997)), we find the principles of *Brady* apply in this type of case.

¶ 43 The State argues applying *Brady* would be "unworkable" in cases involving sexually dangerous persons. The State claims a defendant may have dozens of victims, including former spouses or girlfriends, over an extended period of time. However, the State chooses which victims it will call to prove its case, and thus it should turn over all reports pertaining to the incident about which the victim testifies. We also note the State's complaint carries little weight in this case considering it provided approximately 670 pages of information from multiple counties in Illinois and the State of Florida and the two-page document pertaining to allegations of criminal sexual assault was readily available in the State's Attorney's office in the same building where the proceedings were being held. While it is possible that a defendant's criminal history may be voluminous and spread out over decades such that a police report from an uncharged offense may slip through the cracks, here Dr. Killian noted Riffey's report to police regarding the April 2011 incident when she spoke with the police in June 2012 about the December 2011 assault investigation. Thus, the incident was readily known, and a check of the local records for any reports on the incident would not be unduly burdensome.

¶ 44 As we have found *Brady* applicable to this case, we now look at whether the State committed a *Brady* violation by not handing over Riffey's April 4, 2011, statement earlier.

Clearly, the undisclosed evidence was favorable to defendant because it could be used as impeachment since Riffey's written statement does not allege a sexual assault. Moreover, it appears the State inadvertently failed to provide the document to counsel prior to the start of the proceedings. That leaves the question of whether the document was material to guilt or punishment and whether defendant was prejudiced by not having it before trial.

¶ 45                                                    1. *Riffey*

¶ 46        Riffey testified for the State. Thereafter, a police report concerning an April 3, 2011, incident between Riffey and defendant came to light and was provided to the defense. In her written statement on April 4, 2011, she makes no mention of a sexual assault. The trial court, after hearing defense counsel's objections to the newly discovered evidence, indicated it would allow counsel "a lot of latitude." Defense counsel cross-examined Deputy Gourley about the written statement and agreed nothing indicated a sexual assault had occurred. Counsel then called Riffey and questioned her about the discrepancy between her testimony and her written statement. When asked why she did not say anything about being raped on the night of April 3, 2011, Riffey stated:

> "Because [defendant] had threatened me and told me when he called his father that I better just keep my mouth shut because I'm his wife and he could do it."

When counsel asked her why she gave a statement about the incident in June 2012, Riffey stated she was "finally free" and "able to open up."

¶ 47        It is not unusual for victims of sexual assault to make delayed disclosure. See *People v. Rinehart*, 2012 IL 111719, ¶ 21, 962 N.E.2d 444. The evidence shows defendant's sexual assaults on women were followed by threats to deter disclosure by those women. Moreover, there were references in the record to Riffey shaking from fear while testifying.

¶ 48        Here, after the alleged *Brady* violation, defense counsel was allowed wide latitude in examining the deputy who took the report and in examining Riffey. Riffey explained her reason for her delayed disclosure and the reason for the discrepancy in the report. Considering the trial court had all of this information before it prior to making its ultimate decision, defendant suffered no prejudice. Thus, no *Brady* violation occurred.

¶ 49                                                  2. *The Experts*

¶ 50        While the issue of prejudice is clear-cut as to Riffey, since counsel had the opportunity to challenge her on the discrepancy, it is a closer question when considering Riffey's written statement was not provided to the experts in making their determination that defendant met the factors to be declared sexually dangerous. However, even considering this, we find no prejudice.

¶ 51        Dr. Killian stated that when reading documents in evaluating someone, he never assumes "a witness is telling the truth." Instead, he takes all of the information together and makes his assessment. Defendant points out that Killian stated a defendant's risk potential might decrease if the sexual assault allegations were shown to be untrue and Dr. Jeckel stated he "would have to recalculate." However, if Riffey's written statement must be considered, so too must her reasoning for the delayed disclosure. Thus, putting those two pieces of evidence together, we find no reasonable probability existed that the result of the proceeding would have been different had Riffey's written statement been disclosed earlier. Moreover, it cannot be said

Riffey's statement could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the outcome. Thus, no *Brady* violation occurred.

¶ 52 In claiming the trial court erred in not granting a mistrial, we note defense counsel did not seek to call Dr. Killian back to the stand or question Dr. Jeckel about the statement before he left the stand. While it is true that recalling a psychiatrist to testify, especially psychiatrists who practice outside the county, can be a difficult and time-consuming endeavor, counsel did not make any attempt to do so. Further, counsel did not request a continuance to see if the witnesses could be recalled. A mistrial is an extreme sanction that is not favored when an alternative exists. *People v. Eyler*, 133 Ill. 2d 173, 221, 549 N.E.2d 268, 290 (1989). As no *Brady* violation occurred here, and as alternatives to a mistrial existed, we find the court did not abuse its discretion in denying defendant's motion.

¶ 53                                    B. Sufficiency of the Evidence

¶ 54 Defendant argues the State failed to prove him to be a sexually dangerous person beyond a reasonable doubt. We disagree.

¶ 55 Under section 1.01 of the Act (725 ILCS 205/1.01 (West 2012)), the State had to prove defendant (1) had a mental disorder that existed for more than one year prior to the filing of the petition, (2) exhibited criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault. See *People v. Bingham*, 2014 IL 115964, ¶ 27, 10 N.E.3d 881. Additionally, our supreme court has held the elements of section 1.01 of the Act must "be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *People v. Masterson*, 207 Ill. 2d 305, 330, 798 N.E.2d 735, 749 (2003). While proceedings under the Act are civil in nature, the State's burden of proof is beyond a reasonable doubt. 725 ILCS 205/3.01 (West 2012).

¶ 56 On appeal from a trial court's finding the defendant was a sexually dangerous person, "the reviewing court will affirm the judgment, after considering all of the evidence introduced at trial in the light most favorable to the State, if it determines that any rational trier of fact could have found the essential elements to be proved beyond a reasonable doubt." *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 44, 982 N.E.2d 953. Moreover, " '[t]he reviewing court will not substitute its judgment for that of the trial court or jury on the factual issues that have been raised in the petition, unless the evidence is so improbable as to raise a reasonable doubt that the defendant is a sexually dangerous person.' " *Hunter*, 2013 IL App (4th) 120299, ¶ 44, 982 N.E.2d 953 (quoting *People v. Bailey*, 405 Ill. App. 3d 154, 171, 937 N.E.2d 731, 745 (2010)).

¶ 57 Defendant claims the State failed to prove he suffers from a mental disorder, claiming none of the experts diagnosed him with any type of sexual or paraphilic disorder and the experts' diagnoses have no specific relation to the commission of sexual assaults. However, the Act does not require the State to prove defendant suffers from a specific disorder or a sexual disorder. Instead, section 1.01 of the Act requires the State to prove defendant has a mental disorder that existed for more than one year prior to the filing of the State's petition. 725 ILCS 205/1.01 (West 2012). The Act defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2012). Our supreme court has further held

- 11 -

the State must also show the defendant's condition "results in serious difficulty controlling sexual behavior." *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749.

¶ 58 In the case *sub judice*, Dr. Killian found defendant had "some type of personality disorder, including some pretty obvious antisocial features, especially in light of his fairly extensive criminal history." Killian stated defendant's "probable personality disorder with antisocial features has existed for a period of much more than one year" prior to the filing of the petition, he has demonstrated propensities toward acts of sexual assault, and was "substantially probable to engage in the commission of sex offenses in the future if not confined."

¶ 59 Dr. Jeckel opined defendant suffers from the mental disorders of alcohol and cannabis abuse and a personality disorder, not otherwise specified, with antisocial features, "which predisposes him to engage in recurrent aggressive and/or violent sexual activity with women." Jeckel stated these disorders significantly affect defendant's emotional and volitional capacity and result in an inability to control his violent and sexual impulses. Jeckel stated these disorders have existed for more than a year prior to the filing of the petition and cause criminal propensities to the commission of sexually violent offenses.

¶ 60 The trial court found the reports and testimony from Dr. Killian and Dr. Jeckel to be persuasive and defendant's expert, Dr. Witherspoon, to be unpersuasive. The court also found defendant has no ability to control his actions and it is substantially probable he would engage in the commission of sex offenses in the future if not confined. Considering all of the evidence in the light most favorable to the State, we find the evidence was sufficient for the court to find beyond a reasonable doubt defendant was suffering from a mental disorder necessary to find him to be a sexually dangerous person under the Act.

¶ 61 III. CONCLUSION

¶ 62 For the reasons stated, we affirm the trial court's judgment.

¶ 63 Affirmed.