NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231201-U

NO. 4-23-1201

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 30, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JACOB D. KALLAL, | ) | No. 01CF403 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding that defendant remained a sexually dangerous person under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 through 12 (West 2020)) was not against the manifest weight of the evidence. Defendant also failed to establish either that he received ineffective assistance of counsel or a violation of his right to confront witnesses against him during the underlying proceedings.

¶ 2    In 2001, defendant, Jacob D. Kallal, was declared a sexually dangerous person under the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 through 12 (West 2000)) and committed to the custody of the Illinois Department of Corrections (DOC). In April 2020, he filed an application for recovery under section 9 of the Act (725 ILCS 205/9 (West 2020)), alleging he was no longer sexually dangerous and seeking release from his civil commitment. Following a bench trial, the trial court denied defendant's application. Defendant appeals, arguing (1) his counsel provided ineffective assistance by stipulating to the admission of certain evidence, (2) he

was denied his right to confront witnesses against him, and (3) the State failed to meet its burden of proof and the court's finding that he remained sexually dangerous was against the manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4           In April 2001, the State charged defendant with one count of attempted predatory criminal sexual assault (720 ILCS 5/8-4(a), 12-14.1(a)(1) (West 2000)) and two counts of indecent solicitation of a child (*id.* § 11-6(a)). The charges were based on allegations that defendant solicited two minors who were under the age of 13 "to do an act of oral penetration," exposed his penis, and then forced one minor's head toward his penis with the intent of placing his penis in the minor's mouth.

¶ 5           The following month, in lieu of criminally prosecuting defendant, the State initiated proceedings under the Act. In July 2001, the trial court entered a written order, finding defendant was a sexually dangerous person and ordering him committed to the custody of DOC. On appeal, we affirmed the court's judgment. *People v. Kallal*, No. 4-02-0118 (2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6           Thereafter, defendant twice—in March 2003 and July 2015—initiated proceedings under the Act, alleging that he was recovered and seeking his release from commitment. Both times, defendant was found to still be sexually dangerous and denied release. This court also affirmed those decisions on review. *People v. Kallal*, No. 4-07-0157 (2007) (unpublished order under Illinois Supreme Court Rule 23); *People v. Kallal*, 2019 IL App (4th) 180099, 129 N.E.3d 621.

¶ 7           In April 2020, defendant filed the application for recovery that is at issue on appeal. Citing section 9 of the Act (725 ILCS 205/9 (West 2020)), he alleged he was no longer sexually

dangerous within the meaning of the Act and not currently suffering from a mental disorder "that dispose[d] him to commit sexual offenses." Defendant also asserted that he had completed all aspects of treatment that had been offered to him. He asked the trial court to discharge him or, alternatively, conditionally release him from his commitment.

¶ 8        In September 2020, the trial court appointed counsel for defendant and, pursuant to section 9, directed the circuit clerk to send a copy of defendant's application to DOC so that a socio-psychiatric report concerning defendant could be prepared. In December 2020, a report prepared by Dr. Melissa Weldon-Padera was filed with the court.

¶ 9        In September 2022, defendant filed a motion for an independent psychological examination. The trial court granted the motion, appointing Dr. Richard Travis to evaluate defendant. In April 2023, the court also ordered DOC to complete an updated socio-psychiatric evaluation of defendant. In August 2023, an updated socio-psychiatric evaluation report prepared by Dr. Weldon-Padera was filed. The same month, the court conducted a bench trial on defendant's application for recovery.

¶ 10        At the outset of the trial, the State represented that there was "a stipulation to the foundation being laid for" Dr. Weldon-Padera's two reports. Defendant's counsel agreed and the trial court admitted the reports, stating they would "be considered as appropriate after further review and testimony."

¶ 11        At trial, Dr. Weldon-Padera testified for the State as an expert in clinical and forensic psychology. She stated she evaluated defendant to determine whether he was no longer sexually dangerous. Such evaluations involved interviewing the subject of the evaluation, reviewing his records, consulting with his treatment therapist, and completing "various risk assessment tools." On November 30, 2020, Dr. Weldon-Padera interviewed defendant for 3 hours

and 15 minutes. Ultimately, she prepared an initial evaluation report in December 2020, and an updated evaluation report in August 2023.

¶ 12        When conducting an updated evaluation, Dr. Weldon-Padera "typically review[ed] the person's recent records, primarily their treatment file, and then *** consult[ed] with their primary therapist." After reviewing recent treatment notes, she would determine whether she needed to reinterview the person, which depended "on whether it appear[ed] through the record or the notes that [her] opinion might change." In the present case, Dr. Weldon-Padera testified "there was nothing significant that would have altered [her] opinion, so [she] did not [re]interview [defendant]." She maintained that it was "a generally accepted practice to do an updated report without an interview."

¶ 13        Dr. Weldon-Padera testified that an individual's sexual offending history was an important factor when considering sexual recidivism and that it also was relevant to show an individual's pattern of sexual behavior over time. She reviewed defendant's sexual offending history and noted he was first charged with sex offenses in 1997. Specifically, in three separate cases (case Nos. 97-CM-2811, 97-CM-2561, and 97-CM-3034), defendant faced charges of public indecency and disorderly conduct after driving his vehicle up to four different female victims and either exposing himself or exposing himself and masturbating in front of them. The victims, who ranged in age from 15 to 35 years old (one victim's age was unknown), were all strangers to defendant.

¶ 14        In 2001, at age 22, defendant was charged with public indecency and theft (case No. 01-CF-233) after he approached a 72-year-old female victim while riding his bicycle, asked the victim for the time, masturbated in front of her, and then stole her purse. He was next charged with the underlying offenses, which resulted in the State pursuing his commitment under the Act

- 4 -

(case No. 01-CF-403). Dr. Weldon-Padera testified the victims in the underlying offenses were two eight-year-old female strangers, whom defendant also approached on his bicycle. Defendant engaged in conversation with the victims, showed them a pornographic picture, and asked them 'can you do this?' " He then exposed his penis and masturbated before grabbing the back of one victim's head and pulling her head toward his penis. That victim punched defendant, allowing both victims to run away.

¶ 15        Dr. Weldon-Padera testified defendant initially denied or minimized his offenses but, over time, had come to acknowledge or admit more details regarding what had occurred. She stated that in the "more recent past," he reported letting the two eight-year-old victims go, rather than them running away after one punched him. She also testified that defendant sometimes "struggle[d] to accept full details of what happened," noting that in a group session, he reported that all his victims had been adults.

¶ 16        Dr. Weldon-Padera testified there were other incidents in defendant's history that did not result in criminal charges against him. In 2001, he was a suspect in two other public indecency and disorderly conduct incidents, where a suspect "who matched [defendant's] exact description exposed himself to two adult female employees at a laundromat type of a business." Additionally, in 2006, defendant was investigated for an aggravated criminal sexual assault that allegedly occurred in 2000. In that instance, the alleged victim accused defendant of forcing her to perform oral sex on him when she was seven years old. Dr. Weldon-Padera also looked at defendant's nonsexual criminal history, which would "speak to not only dynamic risk factors *** but also a diagnosis of Anti-Social Personality Disorder." Dr. Weldon-Padera noted defendant had various other arrests, including for retail theft, residential burglary, attempted residential burglary, criminal trespass to land, and criminal damage to property. Additionally, he had been convicted of

two counts of domestic battery.

¶ 17        Dr. Weldon-Padera also considered defendant's disciplinary history at DOC, which was relevant to show how he had adjusted and behaved in a controlled environment and his ability to follow rules. Defendant had six DOC disciplinary reports that involved eight infractions, two of which "were sexual in nature." Specifically, in 2008, defendant received a misconduct ticket for masturbating in the library while watching a female employee and, in 2013, he received a ticket for contraband after being found in possession of pornography in his cell. Although defendant denied the circumstances surrounding the 2008 incident, DOC records showed the female employee reported that she observed defendant masturbating while watching her and, when she confronted defendant about his behavior, defendant "sort of hung his head almost as if ashamed or guilty and then also apologized."

¶ 18        Dr. Weldon-Padera further reviewed defendant's treatment history, stating completion of sex offender treatment was "the biggest protective factor" to reducing the risk of reoffending. Defendant was enrolled in sex offender treatment at DOC. Over time and until recently, defendant's attendance and involvement in treatment was "inconsistent." Dr. Weldon-Padera stated that although defendant never dropped out of the program, he had been absent from 22% of therapy group sessions since the time of her initial evaluation in 2020. She also noted that groups were suspended for almost an entire year during the pandemic. Dr. Weldon-Padera stated that in 2020, defendant completed less than half of his "treatment assignments" and that he "did so in kind of [a] sub-par manner *** because he would leave complete sections altogether undone" and would provide "minimal details." She acknowledged that more recently, in 2022 and 2023, defendant had been turning in assignments that were "more detailed" and which he put "more effort and insight into."

¶ 19    Regarding defendant's group sessions, Dr. Weldon-Padera noted that in 2020, defendant's therapist described his participation as "minimal." By the time of the 2023 updated report, defendant's therapist reported that his "active verbal participation" had increased "to an average level." The therapist also noted that defendant primarily just gave feedback to other group members, rather than focusing on or discussing his own personal issues. Dr. Weldon-Padera testified that an individual in defendant's position would need to discuss his own sex offenses and his own issues and treatment targets "to make progress" in treatment. She further described defendant's treatment progress between 2020 and 2023 as follows:

> "[I]n 2020, the primary therapist had said that [defendant] does have a working knowledge of the treatment concepts, but that his level of internalization of those was unknown at that time because of his low motivation and low participation.
>
> In 2023, his primary therapist said that [defendant] now does show some internalization and understanding of those treatment concepts; but *** she described his treatment motivation and treatment progress as still being sort of minimal *** of what's expected ***."

Dr. Weldon-Padera asserted that it was only within "the last few months" that defendant had been able to show that he was "going to get serious now and start addressing [his] own sex offenses and [his] own issues."

¶ 20    With respect to defendant's most recent treatment plan, his specific treatment goals were (1) capacity for relationship stability, (2) deviant sexual preference, and (3) poor problem solving. According to Weldon-Padera, defendant's therapist also wanted him to work on (1) discussing and reviewing his other sex offenses, in addition to his most recently charged offenses and (2) gaining additional insight into his past sexual preoccupation so that he could

identify interventions to use.

¶ 21 Dr. Weldon-Padera testified that during her interview with defendant, he admitted and accepted responsibility for his charged sexual offenses. However, he also continued "to at times minimize the details of" his offenses, as well as the harm that he caused. In particular, she noted that in a group session approximately three years prior, defendant reported having only adult female victims. Defendant further denied the uncharged accusations against him, including the incident involving the DOC employee. Additionally, Dr. Weldon-Padera found that although there was clearly some evidence of planning or grooming in the details of defendant's offenses, he consistently denied that such occurred and described his offenses as impulsive.

¶ 22 Dr. Weldon-Padera stated it was also important to address defendant's "offense cycle" in treatment, asserting that reviewing what led to the commission of sex offenses helped offenders "to recognize when they might be in a cycle again" and allow them to "implement interventions to avoid re-offending." When Dr. Weldon-Padera interviewed defendant, "he had incomplete and insufficient knowledge of his sexual offense cycle, but *** some awareness of or insight into the precipitating factors that led up to his sex offending." She noted that defendant acknowledged both during their interview and in connection with his most recent treatment plan, which occurred within the past year, "that he still ha[d] to work on his sexual offense cycle." In April or May of 2023, defendant completed "a case report," which she described as "an assignment that [offenders] have that assists them to learn about and explore the various steps in their offense cycle." In his case report, defendant adequately identified the steps that led to his most recently charged sex offenses, along with "all the thoughts, feelings, behaviors, etc." However, she stated defendant needed to complete similar case reports with respect to his other sex offenses, which he would "then incorporate into an overall offense cycle."

- 8 -

¶ 23       Dr. Weldon-Padera discussed "relapse prevention," noting it involved an offender "having a specific plan of action so that when they're triggered or in a high[-]risk situation, they can intervene *** so they don't relapse or re-offend." When she spoke with defendant, he acknowledged that he did not yet have a relapse prevention plan. Defendant was able to list a few emotional triggers, vague or general high-risk situations, and a few external interventions. However, Dr. Weldon-Padera opined that defendant needed to come up with "additional triggers, not just the emotional ones" as well as "more specific high[-]risk situations, not just *** broad or vague ones." Additionally, he needed "to then identify some internal interventions since his were mainly external." She noted defendant's primary therapist also agreed that he still needed to develop such a plan.

¶ 24       In assessing defendant's social skills and support system, Dr. Weldon-Padera found he had satisfactory social skills but an inadequate support network in the community. She stated one individual in defendant's support network had "more negative traits," and defendant needed to review and reassess his list of support people to figure out who could have more of a positive influence on him and assist him to not reoffend. Dr. Weldon-Padera described a "negative support" as someone who might engage in criminal activities or "just even enable the person." One of the individuals defendant was relying on for assistance or support was a younger cousin, "who also himself ha[d] sex offense charges and convictions."

¶ 25       Regarding her overall assessment of defendant, Dr. Weldon-Padera testified that defendant had "some comprehension of the treatment concepts and skills" but that he had "not yet demonstrated complete internalization and consistent application of those things." She elaborated as follows: "So, essentially I'm saying that, yes, he's made some treatment progress for sure; but he hasn't made sufficient or significant enough treatment progress in order to show that he's

sufficiently recovered from being in [DOC] that would substantially reduce his risk to be released."

¶ 26        Dr. Weldon-Padera opined that defendant had three mental disorders: (1) "Exhibitionistic Disorder, sexually aroused by pre-pubertal children and physically mature individuals in a controlled environment," (2) "Cannabis Use Disorder, moderate in a controlled environment," and (3) "Anti-Social Personality Disorder." She characterized defendant's Exhibitionistic Disorder as a paraphilic disorder, stating that, in general, paraphilic disorders "can't be cured, but they can be treated." She further stated as follows:

        "So, the Paraphilic Disorder means he is prone to exposing himself to unsuspecting children and adults. And the Anti-Social Personality Disorder makes that easier for him to do because he doesn't care about *** the rules of society. *** And also, just in general, research shows that anti-social tendencies are linked to higher sexual recidivism."

¶ 27        Dr. Weldon-Padera used risk assessment tools to assess someone's likelihood of reoffending. In particular, she used "three specific actuarial risk assessments of both static and dynamic factors." The Static-99R was used to assess static risk factors, the Stable 2007 was used to assess dynamic risk factors, and the Violent Risk Scale Sex Offense (VRSSO) was used to assess both static and dynamic risks. Dr. Weldon-Padera explained that static factors were "things that won't change except for somebody's age" and that dynamic factors were "things someone can change through treatment."

¶ 28        For the Static-99R, the possible score range was negative 3 to 12. Dr. Weldon-Padera testified defendant scored a seven on that assessment tool, which "place[d] him in the highest risk category to sexually re-offend called well-above average." She stated defendant's score also put him in the 97.2 percentile, meaning that out of 100 sex offenders, 96 would have a

lower score than defendant. His score also "relate[d] to him having a sexual recidivism rate that is 5.25 times higher than the average sex offender." Defendant's score was associated with a 30.7% risk of reoffending within 5 years after his release, a 42.8% risk of reoffending within 10 years after his release, and a 51.1% risk of reoffending within 20 years after his release. Defendant's score on the Static-99R would not change until he reached the age of 60, when he would receive a two-point score deduction.

¶ 29    Dr. Weldon-Padera identified the possible score range for the Stable 2007 as 0 to 26. In 2020, defendant's total score was 12. When Dr. Weldon-Padera prepared her updated report in 2023, she did not "officially" rescore defendant, stating that to do so, she needed a "recent interview, which *** was not required for the updated evaluation." Instead, Dr. Weldon-Padera reviewed the risk factors and defendant's recent treatment notes and "determined that two of his dynamic risk factors may have increased by one point each, which would decrease his score from a 12 to a 10." She stated a score of 12 would have put defendant in "the high risk category" for reoffending, while a score of 10 would put him "in the moderate risk category." She believed a score of 10 was what defendant's score "appear[ed] to be" at the time of trial. Dr. Weldon-Padera also noted that in late 2022, defendant's primary therapist scored him at an 11 on the Stable 2007, which was "close to how [she] scored him as well." She testified that when considered together, defendant's score of 7 on the Static-99R and score of 10 on the Stable 2007 placed him "in the highest risk category for supervision and intervention needs when compared to other sex offenders."

¶ 30    Dr. Weldon-Padera testified that the VRSSO had 7 static factors and 17 dynamic risk factors, and it did not require an interview. On that assessment tool, defendant scored a 42 on a scale that ranged from 0 to 72. His score "placed him in the second highest risk category to

sexually re-offend called above average."

¶ 31　　　　Dr. Weldon-Padera concluded defendant's mental health disorders, in particular his exhibitionistic disorder, were "coupled with a propensity to sexually re-offend." She also opined that defendant was "substantially probable to commit future sex offenses if he [was] not committed or confined." She explained as follows:

> "[Defendant] remains still above to well-above average risk to sexually re-offend. And he hasn't made sufficient treatment progress that we can count towards substantially reducing his risk to re-offend at this time. And he still has some issues that were present at the time of his commitment that he has not fully addressed in treatment."

Dr. Weldon-Padera stated defendant was "on the road to successfully completing" his treatment program, he was capable of learning treatment concepts, and there were no barriers to him completing his treatment program. However, there were five or six specific treatment goals that defendant "need[ed] to more successfully meet." She opined that there were no conditions or restrictions the trial court could impose to keep the community safe if defendant was released at that time.

¶ 32　　　　Ultimately, Dr. Weldon-Padera opined defendant continued to be a sexually dangerous person in need of confinement. Regarding the basis of that opinion, she testified as follows:

> "[T]he risk assessment tools determine him to be still a high risk to sexually re-offend. He's making some treatment progress, but not significant enough that would reduce his risk to re-offend to be conditionally released. And the category specifically of above average and well-above average do indicate that a person with

- 12 -

that level of risk does still require intensive interventions."

¶ 33　　　　The State also presented testimony from Heather Delashmutt, the clinical director of DOC's sexually dangerous persons program and defendant's primary therapist. Delashmutt testified she had worked with defendant in some capacity beginning in 2018 and had been his primary therapist since 2019. Defendant's current treatment involved weekly hour and a half sessions of primary group therapy and enrollment in one of DOC's "additional psychoeducational groups."

¶ 34　　　　In December 2022, Delashmutt reviewed defendant's treatment progress and scored defendant "a total of 11 points" on the Stable 2007. At the time, she noted "that there was still some treatment progress to be made for [defendant]." In particular, defendant had "treatment targets for capacity for relationship stability and deviant sexual preference."

¶ 35　　　　Delashmutt testified she had no concerns about defendant's ability to learn or internalize the concepts provided to him in treatment. She stated that being able to verbalize and participate in group was "one of the biggest things that [she] look[ed] for in a person's ability to move forward in treatment." With respect to defendant's participation in treatment, Delashmutt stated defendant "tend[ed] to go back and forth between active participation and bringing things to group and time periods where he might lay back and not bring as many of his personal issues to group."

¶ 36　　　　In August 2023, treatment plan goals were established for defendant. At that point, Delashmutt noticed that defendant had made progress with his treatment plan but that there were still areas where progress could be continued. Identified targets for defendant included "relationship stability and social influences." In August 2023, defendant also acknowledged matters that he needed to continue working on and identified his current treatment goals as follows:

"present my relapse prevention cycle, abbreviated life history, work on my release plan[,] and present other homework on guilt and shame."

¶ 37        Delashmutt testified that to be ready for release, she would like to see defendant "present a current cycle" and "identify some internal interventions." She noted many of the interventions that defendant had already identified were external, situational, or involved other people. Delashmutt wanted to see defendant "do some internal work, some internal thought work on disputing distortions." She also wanted him to "have a concrete release plan in place." Such a plan could include being able to identify high-risk situations and interventions. For continued progress, defendant would need to continue his verbal participation in group and discuss issues related to himself.

¶ 38        On questioning by the trial court, Delashmutt testified that sex offender treatment at the facility where defendant was committed did not include individual therapy sessions at that time. Rather, therapists liked to have "individual treatment planning meetings" with persons on their caseload, although staffing issues made it "very difficult to do that." The following colloquy occurred between the court and Delashmutt:

"THE COURT: And that is best practice to have an individualized component to the treatment in addition to the groups?

THE WITNESS: Best practice is to identify treatment goals on an individual basis with—uhm, group treatment is the gold standard for sex offender treatment.

THE COURT: So, not necessarily individualized treatment sessions, just an individualized treatment plan that then incorporates groups?

THE WITNESS: Yes."

¶ 39        As part of his case, defendant presented Dr. Travis's testimony and report, and the

State stipulated to Dr. Travis being an expert in the areas of evaluating and treating sex offenders. Dr. Travis testified he met with defendant in November 2022 for a little over two hours. He gave defendant a score of six on the Static-99R assessment tool but asserted such a score did not fairly represent defendant's risk at that time. Dr. Travis noted he gave defendant a score of five on the Stable 2007 assessment tool, which "lower[ed] the risk associated with the Static[-]99R tool."

¶ 40 Dr. Travis agreed that he scored defendant much lower on the Stable 2007 assessment tool than Dr. Weldon-Padera, who believed defendant would have received a score of 10 at the time of her updated report. Contrary to Dr. Weldon-Padera, Dr. Travis believed defendant should have received a lower score in the area of "general social rejection." He explained that score was based on a person's self-report of whether they felt rejected or lonely, "[a]nd if they don't really feel rejected where they are and if their loneliness is not bothersome to them or they don't feel significantly lonely, then you score it a [zero]." Dr. Travis stated he also gave defendant a lower score in the area of "poor problem solving skills," reasoning that defendant had not displayed ineffective problem solving in the last year.

¶ 41 Dr. Travis further scored defendant lower than Dr. Weldon-Padera in the areas of "[n]egative emotionality" and "sex drive and sex preoccupation." He explained that negative emotionality was "about grievance thinking and who the person blames for their current situation." Dr. Travis found that defendant accepted "responsibility for being where he is" and was not currently "play[ing] a victim's stance," as he had in the past. Regarding sex drive and sex preoccupation, he noted as follows: "Since 2014 *** he dramatically decreased his frequency of masturbation, and he's also now on some heart pills, which also lowers his blood pressure, he's not showing any kind of sexual preoccupation, excessive masturbation. It's at a very reasonable rate."

¶ 42 Finally, Dr. Travis also gave defendant a lower score than Dr. Weldon-Padera did in the area of "sex as coping." He stated that when defendant was in the community, he used sex as his main coping strategy. However, Dr. Travis noted "no recent problems" with defendant using sex as coping. Although defendant reported that he would occasionally masturbate to help himself go to sleep, Dr. Travis found that was "not really problematic if it's an occasional thing." He further testified as follows:

> "Well, he's aging, so testosterone level has gone down some probably. A 44-year old doesn't usually engage in sex as often as a 22-year old. And, again, because of the heart medications, which lowers his blood pressure, that also typically reduces just sexual arousal. Doesn't affect the mind much, but it does affect the penis."

¶ 43 Dr. Travis additionally noted that defendant had a "really terrible childhood." He believed that if defendant was released into the community, his treatment should focus on his adverse childhood experiences, stating it was sometimes hard for offenders to accept full responsibility or do well in treatment unless they had "some of their own issues treated." Dr. Travis stated group therapy could aid in addressing issues related to adverse childhood experiences but that it was "also recommended for most people to have at least some component of individual treatment." He did not believe that the treatment defendant could receive while committed focused "specifically on those kind of adverse childhood experiences."

¶ 44 Regarding whether defendant had a current mental health disorder, Dr. Travis testified defendant still had a diagnosis of exhibitionism. He noted that defendant had to be "in the community for five years" before that disorder could be determined to be in remission. Nevertheless, he believed defendant had "impulse control *** in his advancing age, problem

solving abilities, [and] emotional control, such that he's not substantially probable to engage in *** sexual offending." He opined defendant was "less than substantially probable to re-offend" if he was released from his commitment.

¶ 45        Ultimately, the trial court denied defendant's application for recovery. It noted defendant was someone who was "making progress" and had no barriers to his success in treatment. However, the court also concluded as follows:

> "I disagree that there's not a little bit more that can be done as far as a protective factor in this case to make it not substantially probable for him to re-offend. And that's identifying those triggers, identifying your offense cycles, all of them including the ones that offend adult women, and figure out your relapse prevention plan, present it logically, clearly so that this Court can at least feel like it appears that you're no longer dangerous. ***
>
> But the fact that you've made progress in treatment, that it's proven that you can make this progress in treatment, that you can internalize what needs to be done, but you haven't done it yet, does not for this Court make it appear that you're no longer dangerous."

The court determined the State had proved by clear and convincing evidence that defendant remained a sexually dangerous person. It also found that he had mental disorders that created "a propensity for him to commit acts of sexual violence" and that he was "substantially probable to commit acts of sexual offense if released at [that] time. And that is more likely, much more likely than not."

¶ 46        In September 2023, defendant filed a posttrial motion, arguing the State presented insufficient evidence that he remained a sexually dangerous person. Following a hearing in

November 2023, the trial court denied the motion.

¶ 47    This appeal followed.

¶ 48                II. ANALYSIS

¶ 49    On appeal, defendant challenges the trial court's denial of his application for recovery. As noted, he argues he received ineffective assistance of counsel, he was denied his right to confront witnesses against him, and the State failed to meet its burden of showing that he remained a sexually dangerous person under the Act. For the reasons that follow, we find no error.

¶ 50                A. Ineffective Assistance of Counsel

¶ 51    Defendant contends his trial counsel provided ineffective assistance by stipulating to the foundation for, and the admission of, Dr. Weldon-Padera's August 2023 updated socio-psychiatric report. He argues his counsel's action was objectively unreasonable because Dr. Weldon-Padera's updated report was based on outdated information and findings. Specifically, he complains that Dr. Weldon-Padera did not reinterview him in connection with her updated report and that her evaluation was based on a Static-99R scoring form that was completed more than two and a half years prior to trial in April 2020 and a Stable 2007 assessment completed nine months prior to trial in December 2022. Further, defendant maintains that without counsel's erroneous stipulation, there is a reasonable probability that the result of his bench trial would have been different because the State would have been unable to establish that he remained a sexually dangerous person at the time of trial.

¶ 52    "[A] defendant subject to proceedings under the *** Act has a right to effective assistance of counsel." *People v. Lawton*, 212 Ill. 2d 285, 302, 818 N.E.2d 326, 336 (2004). Ineffective-assistance-of-counsel claims are considered under the two-pronged performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Lawton*, 212 Ill. 2d

302. Under that test, a defendant must show both that his counsel's performance (1) fell below an objective standard of reasonableness and (2) "caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *Id.*

¶ 53        As argued by the State, the Act provides for the preparation and consideration of socio-psychiatric evaluation reports when the trial court is presented with an application for recovery. Specifically, section 9(a) of the Act states as follows:

> "Upon receipt [of an application alleging recovery], the clerk of the court shall cause a copy of the application to be sent to the Director of [DOC]. The Director shall then cause to be prepared and sent to the court a socio-psychiatric report concerning the applicant. The report shall be prepared by an evaluator licensed under the Sex Offender Evaluation and Treatment Provider Act. The court shall set a date for the hearing upon the application *and shall consider the report so prepared* under the direction of the Director of [DOC] and any other relevant information submitted by or on behalf of the applicant." (Emphasis added.) 725 ILCS 205/9(a) (West 2020).

Additionally, section 9(c) of the Act states that "all evaluations conducted under this Act and all [DOC] treatment records shall be admissible at all proceedings held under this Act." *Id.* § 9(c).

¶ 54        Here, consistent with section 9(a), Dr. Weldon-Padera evaluated defendant and prepared initial and updated socio-psychiatric reports that were provided to the trial court. On appeal, defendant does not challenge Dr. Weldon-Padera's qualifications or present any other basis for finding the specific requirements of section 9(a) were not met with respect to the updated report Dr. Weldon-Padera prepared and submitted. We agree with the State that under the express terms of the Act, the updated report based on Dr. Weldon-Padera's evaluation of defendant was

admissible at trial, and the court was required to consider it along with other relevant information when ruling on defendant's application. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 44, 188 N.E.3d 1235 (stating counsel cannot be ineffective for failing to object to admissible evidence).

¶ 55　　　　We also agree with the State's assertion that the issue of whether Dr. Weldon-Padera relied on outdated information in connection with her updated socio-psychiatric report went to the weight of that evidence and not its admissibility. The updated report contains Dr. Weldon-Padera's expert opinion that defendant remained a sexually dangerous person under the Act. However, any vulnerability that relates to the basis for an expert's opinion "may be explored on cross-examination and will affect the weight of that testimony rather than its admissibility." *People v. Pingelton*, 2022 IL 127680, ¶ 58, 215 N.E.3d 764; see *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 977, 857 N.E.2d 295, 317 (2006) (finding the expert's failure to interview the individual committed as a sexually violent person was relevant to the issue of the expert's credibility and the weight of his opinion rather than its admissibility); *People v. Pitts*, 299 Ill. App. 3d 469, 476, 701 N.E.2d 198, 204 (1998) (finding "[t]he issue of remoteness goes to the weight of the evidence rather than its admissibility"). In this case, Dr. Weldon-Padera testified at trial and defendant's counsel cross-examined her regarding the bases of her opinions as set forth in both of her socio-psychiatric reports.

¶ 56　　　　Further, the case defendant cites in support of his ineffective-assistance claim—*People v Bailey*, 265 Ill. App. 3d 758, 639 N.E.2d 1313 (1994)—is factually distinguishable. There, the State filed a petition under the Act, asking the trial court to find that the defendant was a sexually dangerous person. *Id.* at 759. Following the filing of the State's petition, the court appointed two psychiatrists to examine the defendant. *Id.* Due to a delay in the commitment proceedings, the State filed a motion asking that the psychiatrists reexamine the defendant. *Id.* at

- 20 -

760. The defendant's counsel opposed the motion, and it was denied by the trial court. *Id.* Ultimately, the court found the defendant was sexually dangerous and committed him to DOC. *Id.*

¶ 57    On review, the Third District found the defendant's counsel provided ineffective assistance by opposing the State's motion to have the defendant reexamined. *Id.* at 764. In reaching its decision, the reviewing court noted the trial court had to determine whether the defendant was sexually dangerous as of the date of its decision and found, given the circumstances of the case, that "it should have been apparent to defense counsel that a more recent examination of the [defendant] by the court's psychiatrists could cause them to reconsider their original diagnoses of sexual dangerousness." *Id.*

¶ 58    In this case, the trial court entered an order for an updated socio-psychiatric evaluation, noting such had been requested by both the State and defendant. Pursuant to that order, Dr. Weldon-Padera did, in fact, update her socio-psychiatric report in August 2023, the same month defendant's bench trial was conducted. For the reasons already expressed, the bases for her opinion in the updated report that defendant remained sexually dangerous were matters for cross-examination and did not affect the admissibility of the report. Under the circumstances presented, defendant cannot establish that his counsel acted deficiently.

¶ 59    Moreover, even assuming defendant could show his counsel's performance was deficient for not objecting to the updated report and that the report should not have been admitted, he cannot establish prejudice. As the State points out, Dr. Weldon-Padera also testified at trial regarding her opinion of defendant's sexual dangerousness. Her opinions while testifying were the same as those expressed in her updated report and, on review, defendant does not challenge the admissibility of her trial testimony. Accordingly, we find defendant's ineffective-assistance claim lacks merit.

¶ 60             B. The Right to Confront and Cross-Examine Witnesses

¶ 61             On appeal, defendant also argues he was denied the right to confront witnesses against him. Specifically, he argues he was denied the right to confront Jessica Stover, who "scored" a Static-99R form that Dr. Weldon-Padera relied upon in her updated August 2023, socio-psychiatric report. Defendant acknowledges that this issue was not raised with the trial court and, thus, not preserved for review. However, he contends we may still consider the issue under the plain-error doctrine or because his counsel was ineffective for failing to raise the issue below.

¶ 62             "When a defendant has failed to preserve an error for appeal, we may review the issue for plain error." *People v. Bush*, 2023 IL 128747, ¶ 71, 234 N.E.3d 754; see *People v. Coan*, 2016 IL App (2d) 151036, ¶ 23 n.1, 57 N.E.3d 1282 (noting "courts have addressed forfeited arguments under the plain-error doctrine in sexually-dangerous-person proceedings," although such proceedings are civil in nature). Relief under the plain-error doctrine is appropriate when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Bush*, 2023 IL 128747, ¶ 71 "The first step under either prong of plain error analysis is to determine whether a 'clear or obvious' error occurred." *Id.*

¶ 63             Additionally, as explained above, a claim of ineffective assistance of counsel is considered under the two-pronged *Strickland* test. *Lawton*, 212 Ill. 2d at 302. To establish an ineffective-assistance claim, the defendant must show both that his counsel's performance (1) fell below an objective standard of reasonableness and (2) "caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *Id.*

¶ 64             Although proceedings under the Act "are considered civil in nature, the right to due

process applies and 'entitles the defendant to the right to confront and cross-examine witnesses testifying against him.' " *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 30, 982 N.E.2d 953 (quoting *People v. Trainor*, 196 Ill. 2d 318, 329, 752 N.E.2d 1055, 1061 (2001)). Whether a defendant was denied due process is subject to *de novo* review. *People v. Sauls*, 2022 IL 127732, ¶ 32, 215 N.E.3d 810.

¶ 65 In *Hunter*, 2013 IL App (4th) 120299, ¶ 31, which involved proceedings under the Act, this court considered whether the testimony of psychiatrists, who relied at least in part on hearsay evidence not subject to cross-examination, violated the defendant's right to confront witnesses against him. Finding no constitutional violation, we noted that "Illinois courts have long held that prohibitions against the admission of hearsay do not apply when an expert testifies to underlying facts and data, not admitted into evidence, for the purpose of explaining the basis of his opinion." (Internal quotation marks omitted.) *Id.* ¶ 32. "Provided the foundational requisites are met, an expert is permitted not only to consider the reports commonly relied upon by experts in their particular field, but also to testify to the contents of the underlying records." (Internal quotation marks omitted.) *Id.* ¶ 33. That standard was codified in Illinois Rule of Evidence 703 (eff. Jan. 1, 2011), which states as follows:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

¶ 66 In *Hunter*, the experts at issue considered information from sources that included police reports, witness statements, health records, and mental health records. *Hunter*, 2013 IL App

(4th) 120299, ¶ 34. This court noted that the information, "though testified to at trial by the experts, was not admitted as substantive evidence." *Id.* ¶ 35. We stated that although the information— such as the contents of police reports—"would be inadmissible hearsay if offered for the truth of the matter asserted, it was not offered for that purpose, and therefore, it [did] not trigger a confrontation violation." *Id.* ¶ 36. We further stated as follows:

> "The record is clear that the experts' testimony was offered for the limited purpose of explaining how they arrived at their respective opinions. The reports upon which they relied were of the nature and type routinely reviewed and relied upon by experts in the field and the experts here were subject to cross-examination. Consequently, we hold [the defendant's] right to confront witnesses was not violated by the presentation of the testimony of [the examining expert psychiatrists]." *Id.*

¶ 67    Here, as explained in *Hunter*, to the extent Dr. Weldon-Padera considered a Static-99R assessment tool that was "scored" by Stover when forming her opinions, she could testify to that basis at trial without violating defendant's right to confront witnesses. In other words, where information is "presented for the purpose of explaining the bases for [an expert's] opinions," it is not being offered to establish the truth of the matter asserted and there is no confrontation clause violation. *Id.* ¶ 38. Defendant's attempt to distinguish *Hunter* is unavailing, and we find no support for his assertion that the Static-99R assessment tool scored by Stover was offered for the truth of the matter asserted therein rather than for explaining a basis for Dr. Weldon-Padera's opinion.

¶ 68    Moreover, we agree with the State that the record does not clearly establish that Dr. Weldon-Padera conveyed hearsay regarding Stover's scoring of a Static-99R assessment tool when testifying at trial. Notably, a "Static-99R scoring form completed by *** Stover" and dated April

6, 2020, was listed as one of the "sources of information" for Dr. Weldon-Padera's updated socio-psychiatric report in August 2023. However, the same was not listed as a source of information for her initial December 2020 report. During her testimony, Dr. Weldon-Padera did not expressly reference Stover's Static-99R scoring form. Further, during cross-examination by defendant's counsel, she responded affirmatively when asked whether her testimony was that *she* scored defendant as a seven using that tool. When asked if she remembered how she reached that score, Dr. Weldon-Padera testified as follows: "I scored [the Static-99R] with the records out in front of me, the coding manual on my laptop and a comprehensive scoring."

¶ 69        Dr. Weldon-Padera's inclusion of Stover's Static-99R scoring form in the list of her "sources of information" in her updated report does not mean that she did not perform her own Static-99R scoring. Additionally, her testimony indicates that she did, in fact, score defendant herself using that assessment tool. Dr. Weldon-Padera testified at trial and was available for cross-examination. We find the circumstances presented do not reflect a violation of defendant's right to confront witnesses against him and, consequently, defendant can establish neither the occurrence of plain error nor ineffective assistance of counsel.

¶ 70                            C. Sufficiency of the Evidence

¶ 71        Finally, on appeal, defendant challenges the sufficiency of the State's evidence. He contends the State failed to meet its burden of showing that he remained sexually dangerous under the Act in that it was substantially probable that he would reoffend. Defendant argues that, as a result, the trial court's denial of his application for recovery was against the manifest weight of the evidence.

¶ 72        The Act establishes "a statutory scheme for the civil commitment of persons who suffer from a mental disorder related to the commission of sex offenses." *People v. Kastman*, 2022

IL 127681, ¶ 32, 211 N.E.3d 459. "As a whole, the Act serves the dual purposes of treatment for those found to be sexually dangerous and protection of the public." *Id.* ¶ 35.

¶ 73        Section 9(a) of the Act (725 ILCS 205/9(a) (West 2020)) provides that a defendant committed to DOC as a sexually dangerous person may file an application with the committing court, "setting forth facts showing that" he has recovered and seeking his discharge or conditional release. At a hearing on the defendant's application, "[t]he State has the burden of proving by clear and convincing evidence that the applicant is still a sexually dangerous person." *Id.* § 9(b). Further, "[t]he Act addresses present, not past, mental conditions and considers whether a person is sexually dangerous on the date of the decision." *People v. Guthrie*, 2016 IL App (4th) 150617, ¶ 43, 57 N.E.3d 621.

¶ 74        Under the Act, a person is sexually dangerous if he has (1) a mental disorder existing for at least one year prior to the filing of the State's petition under the Act, (2) criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. 725 ILCS 205/1.01 (West 2020). The phrase " 'criminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Id.* § 4.05. Additionally, the phrase "substantially probable" had been held to mean "much more likely than not." (Internal quotation marks omitted.) *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188, 747 N.E.2d 444, 453 (2001) (considering the meaning of substantially probable within the context of the Sexually Violent Persons Commitment Act (Sexually Violent Persons Act) (725 ILCS 207/1 through 99 (West 1998))).

¶ 75        The trial court's finding that a defendant remains sexually dangerous under the Act "may not be disturbed on review, unless that decision is against the manifest weight of the

evidence." *People v. Donath*, 2013 IL App (3d) 120251, ¶ 38, 986 N.E.2d 1222. "A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent." *Id.*

¶ 76　　　　Here, following a bench trial, the trial court denied defendant's application for recovery, finding he remained sexually dangerous. The record contains support for the court's decision, and we find it was not against the manifest weight of the evidence. Specifically, Dr. Weldon-Padera opined, based upon her evaluations of defendant, that he was substantially probable to commit future sex offenses if not confined. Testimony from both Dr. Weldon-Padera and Delashmutt showed that although defendant had made progress in treatment, such progress was recent and there were still issues he had not fully addressed in treatment. Dr. Weldon-Padera testified that defendant's assessment tool scores, when considered together, placed him "in the highest risk category for supervision and intervention needs when compared to other sex offenders." Evidence showed there were steps defendant still needed to take to reduce his risk of reoffending, including, as the court found, fully identifying his triggers, his offense cycles, and a relapse prevention or release plan.

¶ 77　　　　Nevertheless, on review, defendant initially argues the State's evidence was insufficient because it did not include a current assessment of his treatment or his risk of reoffending. He contends that for her updated socio-psychiatric report, Dr. Weldon-Padera relied on outdated information. We disagree. Dr. Weldon-Padera's testimony explicitly showed that for her updated report, she considered circumstances and events that occurred following her initial evaluation of defendant in 2020. She explained that when conducting an updated evaluation, she "typically review[ed] the person's recent records, primarily their treatment file, and then *** consult[ed] with their primary therapist." Her testimony showed she considered defendant's participation in group therapy sessions after 2020, how his completion of "treatment assignments"

improved in 2022 and 2023, information provided by his primary therapist in 2023, and his most recent treatment plan. Although Dr. Weldon-Padera did not reinterview defendant, she explained she found it was unnecessary following her review of defendant's recent records.

¶ 78    Defendant further complains that Dr. Weldon-Padera's opinions were based on his outdated assessment tool scores. However, Dr. Weldon-Padera also explained that defendant's Static-99R score had remained the same and was based on factors that would only change when he reached the age of 60. Further, she described how she had altered her analysis of defendant's Stable 2007 score in her updated report, estimating, based on her review of defendant's more recent records, that his score would have decreased by two points as of the time of trial. Accordingly, we find the record makes it clear that the State's evidence included current information about defendant's treatment and his risk of reoffending.

¶ 79    Defendant also argues on appeal that Dr. Weldon-Padera's testimony regarding the percentages applicable to his risk of reoffending, calculated from defendant's Static-99R assessment tool score, did not support a finding that it was much more likely than not that he would commit further sex offenses. He cites testimony from Dr. Weldon-Padera that his Static-99R score was associated with a 30.7% risk of reoffending within 5 years after his release, a 42.8% risk of reoffending within 10 years after his release, and a 51.1% risk of reoffending within 20 years after his release.

¶ 80    In defendant's most recent prior appeal, this court addressed and rejected a substantially similar argument from defendant. In that case, which also involved Dr. Weldon-Padera as the State's expert witness, we stated as follows:

> "Defendant[, in challenging the sufficiency of the State's evidence,] focuses
> on Dr. Weldon-Padera's testimony that defendant's chance of reoffending over the

next five years was only around 40% according to a combined analysis of the Static-99R assessment test and the Stable 2007 assessment test. However, the jury was not only concerned with the next five years. Further, the jury was not required to accept this statistic, and the statistic did not guarantee the likelihood of defendant reoffending. Finally, regardless of the 40% statistic, Dr. Weldon-Padera testified a substantial probability existed defendant would reoffend. Her opinion was based on more information than just these two assessment tools." *Kallal*, 2019 IL App (4th) 180099, ¶ 43.

¶ 81 Defendant seeks to distinguish our prior holding by arguing that, in this case, Dr. Weldon-Padera testified to not only the next 5 years, but also the next 20. He contends testimony that he had a 51.1% risk of reoffending within 20 years after his release made it "barely more likely than not" that he would reoffend, which was insufficient for the State to meet its burden. He also contends that Dr. Weldon-Padera's opinions in the present case were based on the risk assessment tools "and nothing else."

¶ 82 However, whether it is substantially probable that a defendant will reoffend "cannot be reduced to a mere mathematical formula or statistical analysis." *Hayes*, 321 Ill. App. 3d at 188. Instead, a trier of fact "must consider all factors that either increase or decrease the risk of reoffending, and make a commonsense judgment as to whether a [defendant] falls within the class of individuals who present a danger to society sufficient to outweigh their interest in individual freedom." *Id.*

¶ 83 Here, as set forth above, the State's evidence included more than just statistical percentages resulting from the analysis of defendant's Static-99R assessment tool score. Dr. Weldon-Padera opined that defendant was substantially probable to commit future sex offenses if

not confined. Her testimony showed she relied not only on her analysis of *multiple* assessment tools, but also defendant's participation in, and progress with, treatment. In explaining her opinion, she noted that in addition to being well-above-average risk to sexually reoffend, defendant had not "made sufficient treatment progress" and that he had "issues" that were not "fully addressed in treatment." Defendant's contention that Dr. Weldon-Padera's opinions were based solely on the assessment tools "and nothing else" is belied by the record.

¶ 84 Finally, in arguing that the trial court's decision was against the manifest weight of the evidence, defendant also contends the court used the wrong legal standard when denying his application. Specifically, he argues the court appeared to have "erroneously conflated the legal analysis" applicable to sexually dangerous persons under the Act with the analysis of sexually violent persons under the Sexually Violent Persons Act by stating defendant " 'has mental disorders that create a propensity for him to commit acts of sexual violence.' " According to defendant, no testimony or evidence was presented at his trial to support such a finding.

¶ 85 The record shows that in setting forth its decision, the trial court stated as follows:

"[T]he Court believes that the State has met its burden by clear and convincing evidence the Defendant remains a sexually dangerous person. *He has mental disorders that create a propensity for him to commit acts of sexual violence.* And without further treatment of a protective factor of treatment in place, regardless of the discrepancy in actuarial numbers, the threat is still very real.

And the Court believes *he is substantially probable to commit acts of sexual offense* if he is to be released at this time. And that is more likely, much more likely than not. That's the finding the Court is making here today." (Emphases added).

¶ 86 Initially, we note defendant did not raise this issue with the trial court and, thus, the

court was not given the opportunity to address defendant's contention or explain its ruling. Ordinarily, such circumstances would warrant a finding of forfeiture. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 45, 48 N.E.3d 185 (stating the failure to raise an issue with the trial court in proceedings under the Act ordinarily results in forfeiture of that issue on appeal). However, this court has also noted that the forfeiture argument, itself, is in the nature of an affirmative defense that the State may raise, waive, or also forfeit. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 124, 18 N.E.3d 941 (citing *People v. Beachem*, 229 Ill. 2d 237, 241 n.2, 890 N.E.2d 515, 518 n.2 (2008)). In this instance, the State has not argued forfeiture. Thus, we consider the merits of defendant's claim.

¶ 87            As set forth above, required elements for finding that a person is sexually dangerous under the Act include that the person has a mental disorder "coupled with criminal propensities to the commission of sex offenses." 725 ILCS 205/1.01 (West 2020). Further, the phrase " 'criminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Id.* § 4.05.

¶ 88            Here, although the trial court stated defendant had "mental disorders that create[d] a propensity for him to commit acts of sexual violence," it also explicitly found that he was "substantially probable to commit acts of sexual offense." Its latter finding was consistent with the express language of the Act. Moreover, as the State points out, defendant did have a history of being charged with sexually violent offenses. In particular, the offenses that precipitated the underlying proceedings and defendant's commitment as a sexually dangerous person were attempted predatory criminal sexual assault (720 ILCS 5/8-4(a), 12-14.1(a)(1) (West 2000)) and indecent solicitation of a child (*id.* § 11-6(a)). Both offenses qualify as sexually violent offenses

under the Sexually Violent Persons Act. 725 ILCS 207/5(e)(1) (West 2020). As the State contends, a person predisposed to commit sexually violent offenses is also one predisposed to commit sexual offenses.

¶ 89    Given the circumstances presented, the record does not support defendant's claim that the trial court employed the wrong legal standard. We find the court's decision to deny defendant's application for recovery was not against the manifest weight of the evidence.

¶ 90                                    III. CONCLUSION

¶ 91    For the reasons stated, we affirm the trial court's judgment.

¶ 92    Affirmed.